### LEE v. EQUITABLE LIFE ASSUR. SOC. OF UNITED STATES.

#### Civil Action No. 1532.

District Court, E. D. Missouri, E. D.
Aug. 7, 1944.

Lee, Fricke & Lee, of St. Louis, Mo., for plaintiff.

James C. Jones, Jr. (of Jones, Hocker, Gladney & Grand), of St. Louis, Mo., for defendant.

DUNCAN, District Judge.

The essential facts in this case are not in dispute. The amount involved is in excess of $3000. There is a diversity of citizenship. A jury was waived and the case submitted to the court. Exhaustive briefs have been filed by both sides.

On September 23, 1925, defendant issued its policy of insurance upon the life of Thomas J. Lee in the sum of $5000, payable to Mary E. Lee and Catherine E. Lee in equal shares, or the survivor, as beneficiaries. Thomas J. Lee died on the 8th day of September, 1935, and Catherine E. Lee, one of the beneficiaries, died on September 20, 1937. Mary E. Lee, the surviving beneficiary, brings this suit in her own name as beneficiary, and as administratrix of the estate of her deceased sister Catherine E. Lee.

The policy provided for the payment of quarterly premiums in the sum of $50.60 to be paid on the 23rd days of December, March, June and September of each year until the death of the insured. Insured paid all of the quarterly premiums on said policy, except the quarterly premium due on June 23, 1933. Following the failure of the insured to pay the premium on that date, and within thirty days thereafter (the period of grace provided in the policy), the policy was lapsed.

On September 23, 1933, the insured made application to the insurer to reinstate the policy, and tendered to the insurer the sum of $101.83 the amount of the quarterly premium due on June 23, 1933, the payment of which was not made, and a quarterly premium which, except for the lapse of the policy, would have been due on September 23, 1933. The application for reinstatement was rejected and the amount of the premiums tendered were returned to, and accepted by the insured.

At the time the policy was lapsed for nonpayment of the quarterly premium, it had a cash surrender value of $668.00 and a full reserve value of $696.65.

In determining the cash surrender value the insurer deducted from the full reserve value the sum of $28.65 as a surrender charge, and from this balance there was deducted the sum of $606.24 the amount of the loan, leaving a net balance of $61.76, and with this amount, within the time provided by the policy, and in accordance with option (c), the insurer purchased paid up extended term insurance in the sum of $4393.76 (the amount of the face of the policy less the loan) to June 23, 1934. It would have required the sum of $122.66 to purchase paid up extended term insurance to and including the date of insured's death.

At the time the policy was lapsed, there was in the hands of the insurer the sum of $254.53 accumulated dividends which had been declared and which were the property of the insured, and which the insured had notified the insurer to retain under option "4"—"Annual Dividends"—of the policy, i. e. "Left to accumulate at 3% interest, compounded annually."

More than three months after the lapse of the policy, the insurer issued its check payable to the insured in the sum of $254.53, the amount of the dividends, and mailed it to him on the 18th day of November, 1933.

This check was retained by the insured until April 23, 1934 when it was cashed.

Plaintiffs base their right to recover on the grounds (1) that the balance of the cash surrender value of the policy, after the deduction of the amount of the loan, should have been used (a) to pay the premium or premiums as they became due, or (b) that the cash surrender value at the time of the default in the payment of the premium was in excess of the amount determined by defendant and was sufficient to have purchased paid-up extended term insurance beyond the date of the death of the insured, and that the amount thereof should have been so used, and (2) that the insurer should have used the accumulated dividends in the sum of $254.53 notwithstanding the specific directions of the insured to the contrary (a) either to pay the premium or premiums so long as there should be a sufficient amount of money represented by the accumulated dividends in the hands of the insurer to pay quarterly premiums, or (b) upon the failure of insured to pay any quarterly premium, to have used said funds for the purpose of purchasing paid-up extended term insurance, which would have extended the life of the policy beyond the death of the insured, or (c) to have applied the amount of the accumulated dividends as a credit on the loan, thus increasing the amount of the cash surrender value of the policy to that extent. In either event the policy would have been continued in force beyond the date of the death of the insured.

Following the default in the payment of the June 23 premium, and the failure of the insured to exercise one of the four options in the policy, the insurer applied the amount of the cash surrender value, as it contended the amount to be, in accordance with option "c."

The contentions of the plaintiffs will be considered in the order in which they are set out.

(1) a. Using the cash surrender value to pay premium or premiums as they became due. The provisions of the policy relating to Loans and Surrender Value are as follows:

"Options on Surrender or Lapse.

"After three full years' premiums have been paid hereon, upon any subsequent default in the payment of any premium or instalment thereof, and within three months after such default, this policy may be surrendered by the Insured (or assignee if any) who may elect one of the following options:

"(a) To receive the Cash Surrender Value of this policy; or

"(b) To purchase non-participating paid-up life insurance payable at the same time and on the same conditions as this policy, but without double indemnity or total and permanent disability benefits; or

"(c) To continue the insurance for its face amount (and any outstanding dividend additions) as paid-up extended term insurance for the period shown in the opposite Table, or for such further period, as the dividend additions (if any) will purchase, but without future participation, or right to loans, or double indemnity or total and permanent disability benefits.

"In the event of default in the payment of any premium or instalment thereof after this policy has been in force three full years, if the Insured (or assignee if any) does not select one of said options within three months of such default, the insurance shall be continued as provided under Option (c).

"If there be any indebtedness against this policy, the cash surrender value shall be reduced thereby, the paid-up insurance shall be reduced proportionately, and the extended term insurance shall be for the face amount of the policy less the indebtedness and for such period as the reduced cash value will purchase."

■■■ In the event of the lapse of the policy there are four options provided for the disposition of the cash surrender value. That is:

"(a) To receive the Cash Surrender Value of this policy; or

"(b) To purchase non-participating paid-up life insurance payable at the same time and on the same conditions as this policy, but without double indemnity or total and permanent disability benefits; or

"(c) To continue the insurance for its face amount (and any outstanding dividend additions) as paid-up extended term insurance for the period shown in the opposite Table, or for such further period, as the dividend additions (if any) will purchase, but without future participation, or right to loans, or double indemnity or total and permanent disability benefits."

The policy further provides:

"In the event of the default in the payment of any premium or instalment thereof

after this policy has been in force three full years, if the Insured (or assignee if any) does not select one of said options within three months of such default, the insurance shall be continued as provided in option (c)."

The provisions of the policy are clear and unambiguous and leave no doubt as to the method of disposition of the cash surrender value in the event of a lapse of the policy, and are binding in accordance with their express provisions, upon both parties to the contract. It is admitted that no election was made. There is no provision in the policy for the use of any part of the cash surrender value for the payment of premiums as they became due. This insurer applied the cash surrender value of the policy in accordance with its provisions. Therefore, this contention of the plaintiffs is not well taken.

In dealing with plaintiff's second contention, i. e., that the amount of the cash surrender value of the policy was in excess of that determined by the defendant, and was sufficient to have extended the policy beyond the date of insured's death, there are several matters to consider.

As has been heretofore stated, there was a loan against the policy. The amount of the loan had been increased from time to time as the cash surrender value of the policy increased. and at the time of the lapse of the policy, defendant determined the cash surrender value to be $61.76. This amount was arrived at by deducting from the full reserve value of the policy, $696.-65, a surrender charge of $28.65, leaving a net cash surrender value of $61.76 which amount was used, in accordance with Option (c) of the policy.

■ Plaintiffs contend that the $28.65 deduction was not justified, and that the cash surrender value of the policy which was converted to the purchase of paid-up extended term insurance should have been increased by this amount, and with this contention I am inclined to agree.

Although there was a loan on the policy, its possession remained in the insured, and within the time fixed by the provisions of the policy, the insured made application to the insurer for reinstatement of the policy and tendered the necessary amount in payment of the premium. This application was rejected. At no time did the insured agree to any surrender of the policy, which would justify the making of a surrender charge. In fact, every action of the insured evidenced a different intention. If the insurer was entitled to make a surrender charge, certainly the amount deducted was within the provisions of the policy, which are as follows:

"Basis of Computation

"The values stated in the opposite Table are mathematical equivalents and each is equal to the full Reserve at the end of the then current policy year, on the basis stated in the preceding paragraph, *less a surrender charge of not more than $1\frac{1}{2}\%$ of the face of this policy until the completion of the tenth policy year*, at which time and thereafter there is no deduction made as a surrender charge, except that fractions of a month and fractions of a dollar are not allowed." (Emphasis supplied).

The next contention in reference to the amount of the cash surrender value arises over the interest charge on the loan. The loan agreement provided for interest at the rate of 6% per annum to be paid on the anniversary of the loan, and if not paid, to become a part of the principal and thereafter to bear interest at the rate of 6% per annum.

The loan agreement and the policy were Colorado contracts.

Plaintiffs' contention is that the loan agreement provided for compound interest, which of course it did, and that under Chapter 88, Section 1, of the Colorado statute,[1] the loan agreement with respect to interest was unlawful per se, and that no interest whatsoever was chargeable by the insurer upon the loan.

■ If plaintiffs are correct in this contention, the amount of the cash surrender value heretofore determined, increased by the amount of interest, would have been sufficient to extend the policy beyond the date of insured's death. Unquestionably it was an agreement for the payment of compound interest. The loan agreement was a Colorado contract and compound interest contracted for in advance is not generally recoverable under the laws of Colorado. Hochmark v. Richler, 16 Colo. 263, 26 P. 818.

[1] Chapter 88, Sec. 1. "The legal rate of interest on the forbearance or loan of any money when there is no agreement between the parties, as specified in section 3 of this chapter, shall be at the rate of six per cent. per annum."

■ Although the loan agreement provided for compound interest, such provision did not render the contract usurious or prevent the collection of a legal rate of interest. The courts simply decline to enforce the payment of interest upon interest, and the legal rate of interest is enforcible upon the obligation. Hochmark v. Richler, supra.

■ Plaintiffs further contend that the loan agreement was unlawful per se, and that there was no binding agreement for the charging of interest, and that the loan agreement was not a bill, bond, promissory note or other instrument of writing within the terms of the Colorado statute, and therefore interest could be charged only after the maturity date, and the collection of the loan being unenforcible prior to the lapse or maturity of the policy, no interest was chargeable. Certainly the loan agreement was not a bill, bond or promissory note. It was not such an obligation as could be enforced by the insurer during the life of the policy.

As was pointed out by the Supreme Court in Board of Assessors v. New York Life Ins. Co., 216 U.S. 517, 522, 30 S.Ct. 385, 54 L.Ed. 597, and cited by Mr. Justice Hughes in Williams v. Union Central Company, 291 U.S. 170, loc. cit. 179, 54 S.Ct. 348, loc. cit. 351, 78 L.Ed. 711, 92 A.L.R. 693:

"such advances being against the surrender value do not create a 'personal liability' or a 'debt' of the insured, but are merely a deduction from the sum that the company 'ultimately must pay.' While the advance is called a 'loan' and interest is computed in settling the account, 'the item never could be sued for,' and in substance 'is a payment, not a loan.' "

Section 2 of Chapter 88 of the Colorado statutes provides:

"Creditors shall be allowed to receive interest, when there is no agreement as to the rate thereof, at the rate of six per cent. per annum, for all moneys after they become due, on any bill, bond, promissory note or other instrument of writing. * * * "

Section 3 of Chapter 88 of the Colorado statutes provides:

"The parties to any bond, bill, promissory note, or other instrument of writing, may stipulate therein for the payment of a greater or higher rate of interest than six per cent. per annum, and any such stipulation may be enforced in any court of competent jurisdiction in the state."

Abbott defines "written instrument" as: "Something reduced to writing, as a means of evidence." Bouvier, 16 Ed., 1064: "An instrument in the ordinary accepted sense is a document of writing." Burrill and Webster Dictionary: "A writing as the means of giving a formal expression to some act; a writing expressive of some act."

■ Certainly the loan agreement was an instrument of writing as defined in the statute "or other instrument of writing" and I find nothing in the statutes voiding an agreement between the insurer and insured, to charge a legal rate of interest for money advanced by the insurer to the insured out of the value of a policy.

■ It is common knowledge that insurance companies must set up certain reserves, and must receive certain returns for the moneys invested if they are to meet their policy obligations. I do not believe it was the intention of the Colorado statute to prevent insurance companies doing business in that state from making such interest charges. If insurance companies were not permitted to collect interest on such loans, they could not make them. Their whole legal structure is founded upon a definite fixed return upon every invested dollar.

■ Taking this view of the Colorado statute, plaintiffs' position is not sustained, and insurer was justified in computing interest at 6% on the loan. It was, however, not entitled to collect compound interest. The evidence shows that the amount of compound interest collected was $2.87. This added to the $28.65 surrender charge, would bring the cash surrender value of the policy to $93.28, which would still be insufficient to extend the policy beyond the date of insured's death.

2. We are next concerned with plaintiffs' contention respecting the use of the $254.53 in the hands of the insurer representing annual dividends. The policy respecting dividends provides:

"Annual Dividends

"The proportion of divisible surplus accruing upon this policy shall be ascertained annually. Beginning at the end of the second insurance year, and on each anniversary thereafter such surplus as shall have been apportioned by the Society to this policy shall at the option of the Insured (or assignee if any), be either—

"1. Paid in Cash; or, 2. Applied toward the payment of premiums; or, 3.

Applied to the purchase of paid-up Additional Insurance (without double indemnity or total and permanent disability benefits; or, 4. Left to accumulate at 3% interest, compounded annually. If a higher average annual rate is earned, this accumulation may be increased by an interest dividend as determined and apportioned by the Society. Such accumulations will be payable upon the maturity of this policy or on any anniversary of its register date.

"Unless the Insured (or assignee if any) shall elect one of the foregoing options within three months after the mailing by the Society of a written notice requiring such election, the dividend shall be applied to the purchase of paid-up Additional Insurance (Option 3). This Additional Insurance may be surrendered by the insured at any time for the cash value thereof, which shall not be less then the original Cash Dividend."

As heretofore stated, plaintiffs contend that the defendant should have used this amount, or so much of it as was necessary, to pay the quarterly premiums, in the event of their default, or to apply the amount in reduction of the loan, thus increasing the cash surrender value to that extent, making the additional amount available for the purchase of extended insurance.

It will be recalled that pursuant to notice declaring dividends for 1931 the insured notified the insurer under date of December 5, 1931, of his election of Option 4,[2] i. e., "Left to accumulate at 3% interest, compounded annually." At the time of this election by the insured, there had been declared and due to the insured in dividends, the sum of $308.83. Following this election, insured withdrew $110 in January 1932 to pay premiums. Thereafter in 1932 there was declared an additional sum of $44.39 as dividend and interest, and in the year 1933 the sum of $11.31 interest and excess interest, which, pursuant to the notice of December 5 was by the insurer added to the amount already in its possession as accumulated dividends, making the total of $254.53. The policy further provides that:

"* * * Unless the Insured (or assignee if any) shall elect one of the foregoing options within three months after the mailing by the Society of a written notice requiring such election, the dividend shall be applied to the purchase of paid-up Additional Insurance (Option 3). * * *"

The insured elected to have the dividends applied in accordance with Option 4. Following the lapse of the policy, and on November 18, 1933, the insurer mailed to the insured its check for the full amount of the dividends, and the check was retained by the insured until April 23, 1934, when it was cashed by him.

Plaintiffs contend that Chapter 87, Section 65, of Laws of the State of Colorado [3]

[2] "Notification of election of the option to leave dividends on deposit with the Society to *accumulate at interest.*

——— 19— To The Equitable Life Assurance Society of the U. S. 393 Seventh Ave., New York Gentlemen: I hereby give notice that I wish to leave the dividends for the year 19—, and all future dividends under Policy No. 3820 598 on deposit with the Society to accumulate at 3% interest, compounded annually. If a higher average annual rate is earned, this may be increased by an interest dividend as determined and apportioned by the Society. This election is to remain in force until revoked by me in writing. Thos. J. Lee

"This election must be signed by the Insured, or by the Assignee if Policy has been assigned."

[3] Chapter 87, Section 65. "Non-forfeiture.—1. In event of default in payment of any premium due on any policy, except term or convertible term policies, provided that not less than three full years' premiums have been paid, there shall be secured to the insured without action on his part as specified in the policy, either paid-up insurance or extended insurance or the application of the net value of the policy as a loan in payment of future premiums, so long as such net value, less the deduction herein provided for, is sufficient to secure such loan with interest added at a rate not exceeding six per cent (6%) per annum, payable annually in advance; the net value applied to one of the options above provided for shall be at least equal to the entire net reserve held by the company on such policy, including dividend additions, if any, less two and one-half per cent (2½%) of the amount insured by the policy and dividend additions, if any, or one-fifth of such reserve, and less any outstanding indebtedness to the company on the policy at time of default. There shall be secured to the insured the right to surrender the policy to the company at its home office within one month after date of default for the cash value otherwise available for one of the three said options. But the right to cash dividends or to cash surrender value, provided for by this section and the preceding section, may be specifically waived in the policy."

is applicable to this policy, and required the insurer to do one or the other of the things which they contend the insurer should have done. This statute provides:

" * * * there shall be secured to the insured without action on his part as specified in the policy, either paid-up insurance or extended insurance or the application of the net value of the policy as a loan in payment of future premiums * * *."

The policy in suit under "Options on Surrender or Lapse" provides: "(a) To receive the Cash Surrender Value; (b) to purchase non-participating paid-up life insurance * * * (c) continue the insurance for its face amount * * *." And if the insured does not exercise either of the options, the company shall without any further action on the part of the insured, apply the cash surrender value to the purchase of paid-up extended term insurance. That was done by the insurer in this case. That provision of the policy brings it within the requirement of the statute insofar as the amount of the cash surrender value is concerned.

The policy with respect to annual dividends provides (1) paid in cash; (2) applied to the payment of premiums, or (3) applied to the purchase of paid-up additional insurance benefits, or (4) left to accumulate at interest. These provisions certainly comply with the requirements of the Colorado statute as to paid-up insurance or extended insurance. Any provision in the policy complying with either of the three requirements of the statute would be sufficient. The Colorado statute does not aid the plaintiffs in determining how the fund should have been applied. That brings us then to the provisions of the policy itself, which is binding upon the parties.

At the time insured notified the insurer to retain all future dividends under Option 4, there was a sufficient amount in the hands of the company to more than pay the premiums which were not paid, resulting in the lapse of the policy. Thereafter some additional amount was added to these accumulated dividends. Insured therefore must have known that there was a sufficient amount of money on deposit with the insurer to pay the premiums when they became due had he revoked his election of December 5 and elected to receive the dividends in cash, and pay his premiums. But this he did not do.

Under the terms of the policy had the insured not have elected, prior to the lapse of the policy, as to what was to be done with the accumulated dividends, it would have been the duty of the insurer, without any direction from the insured, to apply the amount thereof to the purchase of additional insurance benefits, and this provision of the policy complies with the Colorado statute. Had the insurer purchased paid-up additional insurance benefits, it would not have helped the plaintiffs because it would not have extended the policy, but would have increased the amount of the insurance.

Of course, there is a well defined distinction between paid-up additional insurance and paid-up extended term insurance. By "paid-up extended term insurance" is meant the extension of the amount of insurance due the insured to a fixed time. By the purchase of "paid-up additional insurance" is meant paid-up insurance in addition to the face of the policy, which is purchased with dividends, and the latter does not extend the time within which the proceeds of the policy will be paid, but simply increases the amount. Union Central Life Co. v. Williams, 5 Cir., 65 F.2d 240, loc. cit. 243. The holding of the Circuit Court of Appeals in this respect was approved by the United States Supreme Court in the same case on certiorari. Union Central Life Ins. Co. v. Williams, 291 U.S. 170, loc. cit. 181, 54 S. Ct. 348, 78 L.Ed. 711, 92 A.L.R. 693.

The option provided in the policy for the purchase of paid-up additional insurance benefits complies with the Colorado statute, and it was the only action which was required of the insurer in the absence of any direction from the insured. Of course, it would not have benefited the insured to have the insurer apply the amount of the dividends to the purchase of paid-up additional insurance benefits under the circumstances, because it would not have extended the period of the insurance.

Therefore, the contention of the plaintiffs that the Colorado statute is applicable in this case must be resolved against these plaintiffs. The provisions of the policy under "Annual Dividends" with respect to the options are like those provisions relating to "Loans and Surrender values" and "Options on Surrender or Lapse", clear and unequivocal, and require no construction on the part of the court. There is no pro-

vision in the policy requiring the insurer to apply any part of the dividends to the payment of premiums in the absence of directions by the insured to do so. The insurer did all that it was required to do under the terms of the contract.

■ With respect to plaintiffs' contention that the dividends, or any part of them, should have been applied to the reduction of the indebtedness, thus increasing the cash surrender value, is without merit, as there is no authority in the policy for doing it. Without such direction the insurer had no right, nor was it under any obligation to so apply the dividends, without any specific directions from the insured as to what the company should do with them. Williams v. Union Central Life Ins. Co., 291 U.S. 170, loc. cit. 180, 54 S.Ct. 348, 78 L.Ed. 711, 92 A.L.R. 693.

Plaintiffs strongly urge that the case at issue falls within the general rule that:

Where an insurer has in its possession sufficient unapplied dividends presently due the insured to pay the stipulated premium, it should apply them in extinguishment of the premium and thus avoid lapse of the policy, unless the insured directs otherwise, and that the law will make the application if the insured fails to act, the consent of the Insured thereto being presumed.

There is no dispute about the general rule, but the difficulty with plaintiffs' position is that their case falls within the exception to the rule: "unless the insured directs otherwise". I find nothing in this rule which would require the company to do something different from that provided plainly and unequivocally in the contract between the parties.

There was no authority vested in the insurer, following the election of insured, except to retain the dividends for the purpose of drawing interest. In the absence of such an election, it would have been the duty of the insurer, under the provisions of the policy, to apply such dividends to the purchase of paid-up additional insurance benefits.

It is evident that the insured was in failing health for some time prior to the lapse of this policy. It is also evident that the insurer lost no opportunity to avail itself of every provision of the policy following default in the payment of the premium, realizing the physical condition of the insured, but it lived up to the conditions of its contract. It did no more nor no less than it was required to do.

Many cases have been cited on both sides of the question by the parties in their briefs. I see no occasion to review those many cases here. Most of the questions raised in this case were determined in Union Central Life Ins. Co. v. Williams, 5 Cir., 65 F.2d 240, against the plaintiff. The Court of Appeals in the Fifth Circuit reversed the District Court and held that there could be no recovery. The case went to the Supreme Court of the United States on certiorari and was there affirmed in 291 U.S. 170, 181, 54 S.Ct. 348, 78 L.Ed. 711, 92 A.L.R. 693.

In view of the foregoing, the plaintiffs are not entitled to recover and judgment is directed to be entered for the defendant.