## In re McKINNEY.

(*District Court S. D. New York.* March 16, 1883.)

1. BANKRUPTCY—LIFE INSURANCE—INSURABLE INTEREST—ASSIGNEE.

An assignee in bankruptcy has no insurable interest in the life of a bankrupt, at least after his discharge. Upon a policy on the life of the bankrupt, payable at his death to his executors, administrators, or assigns, with an equal premium payable annually during the bankrupt's life, the only beneficial interest which passes to the assignee in bankruptcy is its surrender value or net reserve at the time of the bankruptcy. Beyond that interest the policy, so far as respects any future insurance under it, would be a burden rather than a benefit, which the assignee is not authorized to continue, and the assignee takes the legal title to the policy for the purpose of making the surrender value or net reserve available to the estate.

2. Policy Kept Alive by Wife of Bankrupt—Surrender by Assignee—
   Surrender Value.
       Where the bankrupt, holding such a policy at the time of his bankruptcy,
   was afterwards discharged from his debts and died several years after, his wife
   having kept the policy alive by payment of premiums subsequent to the bank-
   ruptcy, supposing that the policy was for her benefit, *held*, that the assignee
   should be authorized to surrender the policy on payment of the full net reserve
   or surrender value at the time of the bankruptcy.

In Bankruptcy.

*Kent & Auerbach*, for assignee.

*Evarts, Southmayd & Choate*, opposed.

BROWN, J.   This is an application by the assignee of Andrew Mc-
Kinney, the bankrupt, for leave to transfer to the bankrupt's widow
whatever interest the assignee may have in a life-insurance policy of
$3,000, issued by the Berkshire Life Insurance Company of Massa-
chusetts, upon the life of McKinney, dated July 23, 1856.   The
policy is made payable to his "executors, administrators, or assigns,"
in consideration of the payment of an annual premium of $62.70
during his life.   The matter was referred to Commissioner Osborn,
as referee, to take proof of the facts, who reports that the entire net
value of the policy on the twenty-third of July, 1877, was $686.42,
although that is more than would have been paid for the surrender
at that time.   The policy provided that "no assignment or transfer
of this policy shall be valid without the written consent of the com-
pany, and, in case of death, the claim of any assignee shall be sub-
ject to proof of interest."

At the time of taking out the policy, in 1856, Andrew McKinney
was 28 years of age.   The last annual premium paid by him was
that of July, 1876.   On February 5, 1877, he filed his petition in
bankruptcy and was adjudicated a bankrupt.   On April 6, 1877, the
usual assignment was executed to the petitioner as his assignee, and
on January 9, 1878, he was duly discharged as a bankrupt.   This
policy was mentioned in his schedule of assets.   The assignee took
no steps in reference to the policy, and never paid any premiums upon
it.   The bankrupt's wife, having another small policy for her benefit,
and supposing that this policy was also for her benefit, paid the annual
premiums on this policy, six in number, out of her own funds, until
the death of the bankrupt on October 31, 1882.

Due proofs of death have been made to the company, and it is un-
derstood that they are ready to pay to whoever is legally entitled to
the money, though they have never assented to any assignment to
the assignee in bankruptcy, and do not admit his legal right to it.

On the part of the creditors it is contended that the policy passed to the assignee in bankruptcy for all purposes whatever, and that he is legally entitled to the whole proceeds, although the assignee did nothing to preserve the policy; and, although it did not become payable by the death of the bankrupt until between five and six years after the assignment in bankruptcy, and between four and five years after the bankrupt's discharge, and after the widow had paid six annual premiums; while, in behalf of the widow, it is claimed that the assignee is entitled to no interest in it whatever. Looking at this policy as it stood at the time of the bankruptcy, it presents two entirely different elements,—(1) its cash surrender value at that time; (2) its character as an executory contract, whereby the bankrupt or his representative was to pay an annual premium during his life, and observe numerous other conditions specified in the contract; and the company, if all these conditions were observed, was to pay the sum of $3,000 at his death.

The first of these elements, the surrender value of the policy, arises from the fact that the fixed annual premium is much in excess of the annual risk during the earlier years of the policy, an excess made necessary in order to balance the deficiency of the same premium to meet the annual risk during the latter years of the policy. This excess in the premium paid over the annual cost of insurance, with accumulations of interest, constitutes the surrender value. Though this excess of premiums paid is legally the sole property of the company, still in practical effect, though not in law, it is moneys of the assured deposited with the company in advance to make up the deficiency in later premiums to cover the annual cost of insurance, instead of being retained by the assured and paid by him to the company in the shape of greatly-increased premiums, when the risk is greatest. It is the "net reserve" required by law to be kept by the company for the benefit of the assured, and to be maintained to the credit of the policy. So long as the policy remains in force the company has not practically any beneficial interest in it, except as its custodian, with the obligation to maintain it unimpaired and suitably invested for the benefit of the insured. This is the practical, though not the legal, relation of the company to this fund.

Upon the surrender of the policy before the death of the assured, the company, to be relieved from all responsibility for the increased risk, which is represented by this accumulating reserve, could well afford to surrender a considerable part of it to the assured, or his representative. A return of a part in some form or other is now

usually made; and by the provisions of this policy, under the law of Massachusetts, four-fifths of this reserve or surrender value was applicable on default as a single premium for a paid-up policy.

To any person, moreover, having an insurable interest in the life of the assured, and desirous of maintaining the policy, to whom it might be assigned, this surrender value would be worth its full tabular amount. To the extent of its actual cash surrender value, therefore, this policy, at the time of the bankruptcy, was "property" and "effects" of the bankrupt within sections 5044, 5046, of the Revised Statutes, and as such passed to the bankrupt's assignee. So far as necessary to make the cash surrender value available, the title to the policy also passed to the assignee, so that he might thereafter either surrender it to the company, or assign it over, either to the bankrupt, or to any other person having an insurable interest in his life, on receiving payment of the surrender value at that time, or so much of it as the assignee might be able to obtain.

Beyond this interest in the surrender value I think nothing passed to the assignee in bankruptcy save the naked title to the policy in order to make that interest available. As an executory contract, aside from its surrender value, the policy had no pecuniary value whatever. Assuming that the bankrupt had the average expectation of life, as a mere contract for future insurance it would be a burden rather than a benefit to the estate; for, whatever might be afterwards obtained from it, (beyond the present surrender value,) a still greater sum must presumably be paid out in the shape of future premiums and interest in order to keep the policy alive, since these premiums, with interest on the average, not only equal the amount ultimately payable, but all the company's expenses and profits in addition. As an executory contract, therefore, aside from its surrender value, the policy was not "property" or "effects," but an incumbrance which the assignee would be bound to reject, like leases at an unfavorable rent. *Streeter v. Sumner,* 31 N. H. 542, 557–559; Bump, Bankr. 507. In such cases the assignee has at least an election to reject the contract; and if, knowing its terms, he does nothing to avail himself of it, and allows third persons to acquire an interest in it, he must, as against the latter, be deemed to have rejected it, except in so far as the law itself casts it upon him; which, in this case, is to the extent of the surrender value only. In the language of WARE, J., "it would be highly inequitable to allow the assignee to stand by and await the issue and then to wrest all the fruits of it" from those who had secured it. *Smith v. Gordon,* 6 Law Rep. 313, 317, 318; 2 N. Y. Leg. Obs. 325,

328; *Copeland* v. *Stephens*, 1 Barn. & Ald. 594, 604; *Hanson* v. *Stevenson*, Id. 304, 307; *Lewis* v. *Burr*, 8 Bosw. 140; *Journeay* v. *Brackley*, 1 Hilton, 447.

The assignee, moreover, could have no right to use the moneys of the estate to pay premiums during the bankrupt's life, and thus keep the estate unsettled for an indefinite period, for the mere purpose of speculating upon the chances of the bankrupt's early death. *In re Newland*, 7 N. B. R. 477. The speedy settlement of the estates of bankrupts, as contemplated by law, is incompatible with such dealings.

But not only was the executory part of this policy, *i. e.*, everything beyond its surrender value, not assets of the bankrupt, but the assignee in bankruptcy had no such insurable interest in the life of the bankrupt as rendered him an assignee legally capable of continuing the policy for his own benefit, and ultimately recovering the whole amount under it. An assignee in bankruptcy has no interest, that I can perceive, in the continuance of the bankrupt's life; at least, after his discharge in bankruptcy. The bankrupt's debts, so far as he is concerned, are canceled by the discharge. As the representative of creditors, the assignee can take nothing by the future earnings or acquisitions of the bankrupt, and has no pecuniary interest dependent upon whether the bankrupt lives or dies.

The nature of an insurable interest, such as will support an assignment of a life-insurance policy and enable the assignee to recover under it, has been recently fully considered by the supreme court in the case of *Warnock* v. *Davis*, 104 U. S. 775. It was there held that an assignment to a company having no pecuniary interest in the life of the assured was void. In the opinion delivered the court say:

"It is not easy to define with precision what will in all cases constitute an insurable interest, so as to take the contract out of the class of wager policies. It may be stated, however, generally to be such an interest arising from the relations of the party obtaining the insurance, either as creditor of or surety for the assured, or from the ties of blood or marriage to him, as will justify a reasonable expectation of advantage or benefit from the continuance of his life. It is not necessary that the expectation of advantage or benefit should be always capable of pecuniary estimation, for a parent has an insurable interest in the life of his child, and a child in the life of his parent, a husband in the life of his wife, and a wife in the life of her husband. The natural affection in cases of this kind is considered as more powerful, as operating more efficaciously, to protect the life of the insured than any other consideration. *But in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the as-*

*sured.*  Otherwise the contract is a mere wager by which the party taking the policy is directly interested in the early death of the assured.    Such policies have a tendency to create a desire for the event.    They are, therefore independently of any statute on the subject, condemned, as being against public policy."

In the present case there is no ground upon which the assignee could expect any benefit or advantage from the continuance of the life of the assured after his discharge in bankruptcy.    There would be no consideration, either of kindred or pecuniary benefit, to offset the direct interest under the policy in the early death of the assured; and hence, under the above decision, the only beneficial interest which would pass to the assignee, or which he could insure or protect by the further payment of premiums, would be the surrender value at the time of the bankruptcy.

The condition in the policy, that a transfer "shall not be valid without the consent of the company," is another impediment.    The company is directly interested in preventing any assignment to persons whose only pecuniary interest is in the speedy death of the assured; and any assignment, it is further provided, shall be subject to proof of interest.    Both of these provisions are obviously valid conditions, and would limit the assignee's recovery in any event to the surrender value, and any premiums subsequently paid to protect it.

As the surrender value at the time of the bankruptcy was its whole pecuniary value at that time, and was the only beneficial interest which could then pass to the assignee, and as he had no interest in the continuance of the bankrupt's life after his discharge, which could make valid any further insurance for his benefit as assignee, it follows that the receipt of the surrender value is all that he ever became legally entitled to; and that the report should, therefore, be confirmed, and an order entered allowing the transfer on payment of the ascertained value as reported.