**UNITED STATES of America,**
**Plaintiff,**

v.

**Albert SALERNO and the Mutual Life Insurance Company of New York,**
**Defendants.**

**Civ. No. 380.**

United States District Court
D. Nevada.

Oct. 18, 1963.

John W. Bonner, U. S. Atty., Las Vegas, Nev., for plaintiff.

Morse & Graves, Las Vegas, Nev., for defendant Mutual Life Ins. Co. of New York.

THOMPSON, District Judge.

This is an action by the United States against Albert Salerno to recover judgment for unpaid income taxes due, and against the Mutual Life Insurance Company of New York to foreclose a lien against the cash surrender value of a life insurance policy written on the life of defendant Albert Salerno, and owned by him. Salerno defaulted, and on October 5, 1962, default judgment was taken against him for the tax deficiency. Mutual Life answered and opposes judgment to the extent that automatic premium loans have reduced the cash surrender value of the policy since the date of attachment of the tax lien.

The stipulated facts disclose that a Notice of Federal Tax Lien was recorded in the office of the County Recorder of Clark County, Nevada on January 30, 1957. On June 18, 1958, a notice of the tax lien was served on Mutual Life at its home office in New York City, New York. On February 11, 1960, the District Director of Internal Revenue served on Mutual Life a Notice of Levy and demand for payment of the cash surrender value of the policy pursuant to 26 U.S.C. §§ 6331, 6332.

Although there is some discrepancy among the figures stated in the Stipulation of Facts and in the briefs on file, it appears that on June 18, 1958, the insurance policy had a net cash value of $979.38; on February 11, 1960 of $660.-96; and on August 28, 1962 and presently, of $494.59. On the last date, the policy, by its terms, was converted to reduced, paid-up participating insurance.

The reduction in cash value resulted from automatic premium loans charged by Mutual Life against the policy, as follows: November 6, 1958, $155.65; October 27, 1959, $155.65; November 9, 1960, $155.65; November 8, 1961, $155.65. In addition, interest on the loans served further to reduce the cash value.

In the insurance policy here involved, defendant Salerno reserved the right to change the beneficiary and all incidents of ownership were vested in him. The policy provides, in part: "At any time that this policy has a cash value, it may be surrendered for such value less any indebtedness to the company". The policy also provides:

"AUTOMATIC PREMIUM LOAN—This provision shall become operative if requested in the application for this Policy, or whenever written request for it is received by the Company at its Home Office before any premium is in default beyond the grace period. It shall become inoperative as to premiums not yet paid upon receipt by the Company at its Home Office of written request to that effect.

"While this provision is operative, each premium for this Policy due and not otherwise paid will be automatically paid by loan on the last day of the grace period, provided the loan value of this Policy is at least as great as the entire premium plus any existing indebtedness to the Company; otherwise the provision 'Reduced Paid-up Life Insurance on Lapse' shall apply."

In the application for the policy, Salerno requested the automatic premium loan provision to be operative.

In Orleans Parish v. New York Life Ins. Co., 216 U.S. 517, 30 S.Ct. 385, 54 L.Ed. 597, the Supreme Court held that a "loan" against the cash value is in substance and reality "a payment, not a loan" and "merely a deduction in account from the sum the plaintiffs (insurer) ultimately must pay". We, therefore, are not faced with a problem of priority of conflicting liens.

In its Complaint and Opening Brief, the Government asserts the right to judgment against Mutual Life for $979.-38, the cash surrender value when the notice of tax lien was served on Mutual Life on June 18, 1958. In its Memorandum of Contentions of Fact and Law filed December 21, 1962, Mutual Life concedes that if the insured is compelled to surrender the policy, it owes $494.59 under the federal tax lien. In its Supplemental Points and Authorities filed February 26, 1963, Mutual Life reaffirms this position. The Government, in its Reply Brief filed March 6, 1963, claims a judgment against Mutual Life for $660.96, the amount of the cash surrender value as of the date of the levy on Mutual Life, that is, February 11, 1960. The only explanation given for this change of position is the statement that in the Government's brief on appeal of the case of United States v. Wilson, D.C., 191 F.Supp. 69; D.C., 195 F.Supp. 332, the Government had adopted the view "that the lien against the cash surrender value of the insurance policies did not become effective until the date of levy."

These varying claims present questions of the proper construction and application of the lien and levy provisions of the Internal Revenue Code as applied to the cash surrender value of life insurance policies.

Since the decision of the Supreme Court in United States v. Snyder, 149 U.S. 210, 13 S.Ct. 846, 37 L.Ed. 705, sustaining the validity and enforceability of an unrecorded federal tax lien against a subsequent bona fide purchaser for value, the secret lien enjoyed by the tax collector upon "all property and rights to property" owned by a delinquent taxpayer has been the source of extensive litigation. Congress afforded partial relief by enacting 26 U.S.C. § 6323 declaring the lien invalid as to any mortgagee, pledgee, purchaser or judgment creditor unless recorded, and requiring notice or knowledge at the time of such transactions with respect to certain intangibles within a restricted definition

of a "security". The net result was to continue the secret lien in effect in its application to a variety of intangible property rights not encompassed within "security" as defined. For example: United States v. Eiland, 4 Cir., 223 F.2d 118, a debt; Bank of Nevada v. United States, 9 Cir., 251 F.2d 820, bank account; Glass City Bank, etc. v. United States, 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56, fee for services as court receiver; Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365, amounts due under a construction contract; Beeghly v. Wilson, D.C., 152 F.Supp. 726, renewal commissions of an insurance agent; Sims v. United States, 359 U.S. 108, 79 S.Ct. 641, 3 L.Ed.2d 667, salaries.

■ The statute declares (26 U.S.C. § 6322) that "the lien imposed by section 6321 shall arise at the time the assessment is made." Accordingly, controlling authority holds that a perfected, choate lien attaches against all the delinquent taxpayer's property and rights to property at the time of assessment of the tax deficiency (United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371; Bank of Nevada v. United States, supra).

Many of the problems thought to exist regarding life insurance policies were set at rest by the decision of the Supreme Court in United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135, holding (1) an owner's right to demand and receive the cash surrender value of a life insurance policy is "property and rights to property" to which a federal tax lien attaches under the provisions of 26 U.S.C. § 6321; (2) no state exemption statutes can exempt this property right from attachment of tax liens created by federal statute; (3) the transfer of property subsequent to the attachment of the lien does not affect the lien. Describing the character of the "property and rights to property" represented by the cash surrender value, the Supreme Court said:

"The cash surrender value of the policy, however, stands on a different footing. The insured has the right under the policy contract to compel the insurer to pay him this sum upon surrender of the policy. This right may be borrowed against, assigned or pledged. Slurszberg v. Prudential Ins. Co., supra [15 N. J.Misc. 423, 192 A. 451]. Thus Mr. Bess *'possessed just prior to his death,* a chose in action which he could have collected from the insurance companies in accordance with the terms of the policies.' 243 F.2d 675, 678. It is therefore clear that Mr. Bess had 'property' or 'rights to property,' within the meaning of § 3670, in the cash surrender value. United States v. Hoper [7 Cir.] 242 F.2d 468; Knox v. Great West Life Assurance Co. [6 Cir.], 212 F. 2d 784; United States v. Royce Shoe Co. [D.C.], 137 F.Supp. 786; Smith v. Donnelly [D.C.], 65 F.Supp. 415; United States v. Aetna Life Ins. Co. [D.C.], 46 F.Supp. 30." (Italics added)

Here Mutual Life argues, consistently with the insurance industry's contentions in other cases, that the owner's right to demand the cash value is not a clear, unconditional chose in action, but is expressly conditional upon (a) election by the owner to demand the cash value, and (b) physical surrender of the policy. With these contentions we do not agree. They have been effectively answered by the courts in United States v. Brody, D.C., 213 F.Supp. 905 (life insurance policy); Commonwealth Bank v. United States, 6 Cir., 115 F.2d 327 (bank passbook); United States v. Manufacturers Trust Co., 2 Cir., 198 F. 2d 366 (bank passbook); United States v. Emigrant Industrial Savings Bank, D.C., 122 F.Supp. 547 (bank passbook). Any interception by legal process of a contract obligation ipso facto requires the obligation to be discharged otherwise than in accordance with the terms of the contract. The chose in action described by the Bess case, supra, is the right of the policy owner to demand the cash value. This is the right against

which the federal tax lien attached on the date the assessment was made.

In the instant case, we are faced with the fairly narrow question of the power to enforce a federal tax lien against the cash value of life insurance where the only intervening transactions were so-called automatic premium loans. Yet the logical extension of the principles upon which a decision here is founded should govern transactions with respect to many kinds of intangible property. As we have seen, debts due the delinquent taxpayer, salaries, commissions, bank accounts and many like intangibles, are property subject to the tax lien. What protects the debtor who pays his tax delinquent creditor or the bank which honors a withdrawal from an account after an assessment has been made and a lien has attached?

It has been suggested that relief in these situations is dependent entirely upon the good will and beneficent attitude of the Tax Collector expressed through Revenue Rulings (such as Rev. Rul. 56–48 and Rev.Rul. 63–55 dealing with life insurance policies; and Rev. Rul. 57–367 concerning bank accounts),[1] or manifested by the Collector's failure to take action. Perhaps also some succor is at hand because of unexplained shifts of position by the Department of Justice, as in the instant case.

The practical problems and possible inequities were suggested by the Court in Beeghly v. Wilson, D.C., 152 F.Supp. 726, in the following language:

"Where there is a tax lien outstanding against a taxpayer, it would seem that if the Government chose to enforce that lien against intangibles to the fullest extent, then any bank paying a check of such taxpayer, any insurance company making payments of cash surrender values, disability payments or annuity payments, any party making payment to such taxpayer for services, or any party settling either a contract or tort claim with such taxpayer would be subject to the hazard of paying the same over again to the Government. Except as to such parties that come within the protection of Section 6323, the tax lien would for all practical purposes be a secret lien since it would come into existence and continue from the time the taxes were assessed in Washington, D. C. It would appear that the Government as a matter of policy has been sparing in its enforcement of tax liens against intangibles of the kind noted. See Note, Effect Of A Federal Tax Lien On A Bank Deposit, 42 Iowa L.Rev. 412–420 (1957)."

The suggestion that the citizen is protected by the "sparing" use of its powers by the Government tax collector is to this writer little consolation. Surely, the law should expressly and understandably declare when an enforceable lien exists, and such lien should be equally enforced in all situations where it exists.

It is the view of this Court that some of the problems may be obviated by clearly and carefully distinguishing between the lien against a delinquent taxpayer's property and the personal liability, if any, of a third person possessing or exercising any control with respect to the liened property.

■■ A lien in the general sense is a charge against specified property as security for a debt or obligation (33 Am. Jur. 419; 53 C.J.S. Liens § 1, p. 826). The lien itself creates no personal liability of any kind whatsoever. It continues in existence only so long as the property charged continues in existence, and the lien dies with the destruction of the property against which it is a charge. The lien is enforceable as a lien only insofar as the lienor is able to follow, locate and control the specific property, either by court process, summary seizure

---

[1] It would unduly lengthen the opinion to quote the Revenue Rulings. However, it should be noted that the treatment of insurance policies was changed without explanation.

and sale, or otherwise. If the specific property cannot be so located and subjected to the lienor's control, the lien is as effectively lost as if it had never existed. Where the lien is asserted against a chose in action, the value of the lien as security may be destroyed or diminished by payment, discharge in bankruptcy, or other event, just as surely as the value of a lien on a horse may be nullified by the death of the horse.

True, persons wrongfully dealing with the property subject to the lien may be subjected to personal liability on independent grounds. Congress has recognized this possibility in the enactment of 26 U.S.C. § 6332, as follows:

"(a) Requirement.—Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary or his delegate, surrender such property or rights (or discharge such obligation) to the Secretary or his delegate, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

"(b) Penalty for violation.—Any person who fails or refuses to surrender as required by subsection (a) any property or rights to property, subject to levy, upon demand by the Secretary or his delegate, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of the taxes for the collection of which such levy has been made, together with costs and interest on such sum at the rate of 6 percent per annum from the date of such levy."

■ However, in the absence of independent grounds for imposing liability for a person's conduct affecting the property subject to the lien, the sole right of the lienor and the sole power of the Court in an action to enforce and foreclose the lien is to take action against the specific property in the condition in which it is found at the time of foreclosure. The Court cannot bring to life a dead horse or rebuild a liened vehicle which has been damaged by collision.

■ Applying these concepts to the instant case, the Government asserts a lien against the cash value of an insurance policy. This is a chose in action, a right of the insured to surrender the policy and demand cash. If defendant Salerno were exercising that right at this time, he would receive $494.59, according to the stipulated facts. This represents the full extent of the Government's right in the foreclosure of its lien. It can seize only the property that remains subject to the lien.

However, the rules [F.R.Civ.P. 54(c)] admonish the Court to "grant the relief to which the party in whose favor it is rendered is entitled" under the law and the established facts. Here the stipulated facts establish that on February 11, 1960, a notice of levy and demand were served on Mutual Life, and Mutual Life failed and refused to "surrender such property or rights (or discharge the obligation)." At that time, had defendant Salerno demanded the cash surrender value, he would have received $660.96. Under the provisions of 26 U.S.C. § 6332, Mutual Life is personally liable to the United States for the sum of $660.96, together with costs and interest at the rate of six per cent per annum from February 11, 1960 (Sims v. United States, 359 U.S. 108, 79 S.Ct. 641, 3 L. Ed.2d 667).

Because the so-called "automatic premium loans" were payments, not loans, we are not here concerned with priorities. Our effort has been only to identify and define the "property and rights to property" upon which the Government had a lien and which still exists subject to the lien. A lien is only a lien, and nothing more. It is not a guaranty that the liened property will continue in existence for any period of time or forever.

In any action seeking only foreclosure of a lien, it is immaterial how the property came to the condition in which it is found, whether innocently or wrongfully. If a cause of action has arisen in favor of the Government on account of the present condition of the liened property, that will be for another day and a different lawsuit.

So far as we are presently advised, Section 6323 represents the only declaration by Congress of the circumstances under which personal liability against a third person may be charged in connection with property to which a federal tax lien has attached.[2] This requires a levy and demand. It is to this provision that we have looked to support the judgment for the plaintiff. In view of its requirements, the simple notice of lien served on Mutual Life on June 18, 1958 was meaningless and ineffectual, and in no wise modified the rights and liabilities already existing by virtue of the assessment against defendant Salerno and the federal lien created by Section 6321.

We are fortified in our conclusions by the opinion written by Chief Judge Parker in United States v. Eiland, 4 Cir., 223 F.2d 118, granting priority to a tax lien against a trustee in bankruptcy where notice of the lien had never been recorded but the District Director had served a Notice of Levy on the taxpayer's creditor prior to bankruptcy adjudication. Pertinent extracts from the opinion are:

"There is nothing in 26 U.S.C. § 3672(a) (1) which invalidates as against a trustee in bankruptcy rights acquired under such a levy upon a debt. That section has reference to liens upon tangible personal property having a situs, not to the levy upon or the transfer of debts, as to which no recording of lien could be of any advantage to creditors.

\* \* \* \* \* \*

"Only tangible property can properly be said to be 'situated' in a county within the meaning of the statutes quoted; and it would be unreasonable to apply their provisions to debts, since debtors could not be expected to search the clerk's office before paying a debt, to see whether or not tax liens had been filed against their creditors, nor could banks be expected to make such search before honoring checks drawn on deposits. With respect to such intangible property entirely different provisions are needed and have been made by the taxing statutes. *Prior to levy and notice, the debtor may discharge his debt by payment to the creditor, whatever may have been filed in the clerk's office;* thereafter it may be discharged as to the amount of the tax, only by payment to the Director. 26 U.S.C. § 3710(b). (Italics added)

\* \* \* \* \* \*

"The effect of the section as amended is to vest the trustee, not only with rights with respect to the bankrupt's property which creditors had acquired at the date of bankruptcy, but also with all rights which creditors might have acquired by legal or equitable process on that date; but this does not help the trustee here, since no creditor could have acquired any rights on that date with respect to a debt on which the United States had already made a levy and served a notice, *the effect of which was to transfer the right to receive payment of the debt to the United States. We need not concern ourselves here with what the rights of the United States would be had there been no levy and its rights were dependent upon the inchoate lien on all property created by sections 3670 and 3672 of Title 26 of the Code.* In such case, questions of a very different nature would be presented. What we have is a per-

---

2. We note that 26 U.S.C. § 7206 imposes criminal liability for certain types of misconduct affecting property on which a levy is authorized (United States v. Bergman, 3 Cir., 306 F.2d 653).

fected lien created by levy with respect to a specific indebtedness. See Goggin v. Division of Labor Law Enforcement, of California, 336 U.S. 118, 69 S.Ct. 469, 93 L.Ed. 543; United States v. Sands, 2 Cir., 174 F.2d 384." (Italics added)

We agree generally with the conclusions of the Courts in United States v. Mitchell, D.C., 210 F.Supp. 810, and United States v. Sullivan, D.C., 203 F. Supp. 1, and particularly the holdings that the insurance company has the right and power to perform the obligations of the insurance contracts after actual notice of the federal tax lien and even after levy and demand under 26 U.S.C. §§ 6331 and 6332, thus reducing or impairing the property right against which the lien attached, and leaving only the cash value at the time of foreclosure existent as security for the tax liability. However, we do not believe that the levy and demand are rendered ineffectual because of the Government's inability physically to surrender the policy at that time. The insurance company incurs personal liability for the cash value under 26 U.S.C. § 6332 at the time of levy and demand which, if so advised, it may then, with impunity, discharge by payment to the Secretary or his delegate.

It is, therefore, the judgment of the Court that the Internal Revenue lien of the United States be declared and established and foreclosed against the existing property of the defendant Salerno, to wit, his right and chose in action against Mutual Life to demand and receive the present cash value of the insurance policy, that is, $494.59. Upon payment of such sum, Policy No. 723–89–28S, dated August 28, 1951, written by the Mutual Life Insurance Company of New York upon the life of Albert Salerno, in the face amount of $5,000, shall be deemed surrendered and cancelled, and no one, as owner, beneficiary, or otherwise, shall thereafter have and enjoy any rights under and by virtue of such insurance contract.

It is further ordered that plaintiff have judgment against defendant Mutual Life for $660.96, with interest from February 11, 1960 at the rate of six per cent per annum, and costs. This judgment is not cumulative inasmuch as under 26 U.S.C. § 6332, the personal liability of the person levied upon, when satisfied, is a discharge of the obligation and a substitute for the property or rights to property withheld.

Plaintiff is directed to prepare and submit a form of Judgment in accordance with this Opinion.