UNITED STATES of America,
Appellant.

v.

Cornelius W. SULLIVAN et al.

No. 14091.

United States Court of Appeals
Third Circuit.

Argued April 5, 1963.

Submitted Oct. 12, 1963.

Decided April 10, 1964.

John B. Jones, Jr., and Joseph Kovner, Attys., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Michael A. Mulroney, Attys., Dept. of Justice, Washington, D. C., Joseph S. Ammerman and Gustave Diamond, U. S. Attys., Thomas J. Shannon, Asst. U. S. Atty., on the brief), for appellant.

Alexander Black, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa. (John M. Reed, Reed & Egler, Pittsburgh, Pa., John H. Filer, Hartford, Conn., on the brief), for appellee Aetna Life Ins. Co.

Gilbert J. Helwig, Pittsburgh, Pa. (J. Tomlinson Fort, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., E. H. McVitty, Toronto, Canada, on the brief), for appellee Manufacturers Life Ins. Co.

Thomas Lewis Jones, White, Jones & Gregg, formerly White & Jones, Pittsburgh, Pa., for General American Life Ins. Co.

K. Martin Worthy, Glenn L. Archer, Jr., Hamel, Morgan, Park & Saunders, Washington, D. C., for Life Insurance Ass'n of America, amicus curiae.

Before BIGGS, Chief Judge, and McLAUGHLIN, KALODNER, STALEY, HASTIE, GANEY and SMITH, Circuit Judges

BIGGS, Chief Judge.

The United States brought this action under Section 7403 of the Internal Revenue Code of 1954,[1] to foreclose a tax lien

1. Section 7403 is entitled "Action to enforce lien or to subject property to payment of tax" and provides as follows:

"(a) Filing.—In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary or his delegate, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability.

"(b) Parties.—All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto.

"(c) Adjudication and decree.—The court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all

on unmatured insurance policies. Defendants in the proceeding below in addition to the delinquent taxpayers, Cornelius W. Sullivan and his wife, Mary E. Sullivan, were the Aetna Life Insurance Company ["Aetna"], and the Manufacturers Life Insurance Company ["Manufacturers"].[2] From adverse determinations in the court below, reported at 203 F.Supp. 1 (1962), the Government has appealed.

There is no question that the Commissioner of Internal Revenue can reach the "cash surrender values" of a delinquent taxpayer's unmatured insurance policies and can apply the amounts realized to the satisfaction of the deficiency. The issues raised on this appeal concern the fundamental problem of the means by which the foregoing can be accomplished and the interrelated question of the proper measure of the Commissioner's recovery.

The facts are not in dispute. On November 4, 1952 the Commissioner made an assessment of income taxes with penalties and interest jointly against the Sullivans for deficiencies for the year 1950. On November 5, 1952 the District Collector received the assessment list from the Commissioner and vainly demanded payment from the Sullivans. A lien against the Sullivans' "property and rights to property" automatically arose at this time under Section 3670 of the Internal Revenue Code of 1939.[3]

Thereafter, between November 8, 1952 and April 6, 1953, and pursuant to Section 3672 of the Internal Revenue Code of 1939,[4] notice of lien was filed of public record in various counties.[5]

The outstanding tax liability of the Sullivans was partially reduced subsequently pursuant to a determination of the United States Tax Court. In addition, some of the amount due was recovered. A balance of $163,486.54 was still outstanding at the time of commencement of the present action.

cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States.

"(d) Receivership.—In any such proceeding, at the instance of the United States, the court may appoint a receiver to enforce the lien, or, upon certification by the Secretary or his delegate during the pendency of such proceedings that it is in the public interest, may appoint a receiver with all the powers of a receiver in equity."

2. Various other parties were also originally involved in the proceeding but they need not be mentioned here. The case at bar was tried to the court without a jury. It was properly consolidated and tried with United States v. Kann, which is also on appeal to this court, the opinion on which is filed concurrently herewith and is reported at 333 F.2d 146 (1964).

3. Section 3670 provides as follows:
"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, penalty, additional amount, or addition to such tax, together with any costs that may accrue in addition thereto) shall

be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

4. Section 3672 provides in pertinent part:
"(a) **Invalidity of lien without notice.** Such lien shall not be valid as against any mortgagee, pledgee, purchaser, or judgment creditor until notice thereof has been filed by the collector—
"(1) **Under State or Territorial laws.** In the office in which the filing of such notice is authorized by the law of the State or Territory in which the property subject to the lien is situated, whenever the State or Territory has by law authorized the filing of such notice in an office within the State or Territory;
* * *"
The corresponding provision of the 1954 Code, Section 6323, is identical in relevant respect.

5. The view we adopt in this case is such that it is not necessary to detail the facts relating to the several recordations of tax lien by the Government nor to consider the validity of the filings in the abstract. For present purposes it can be assumed that the steps taken by the Government in this regard were such as to constitute compliance with the terms of Section 3672.

On May 21, 1953 the Sullivans purchased an insurance policy from Aetna, No. P 975 434, in the face amount of $10,000. On June 17, 1953 the Sullivans purchased an insurance policy from Manufacturers, No. 1 250 226, in the face amount of $15,000.[6] Under each of the policies Mrs. Sullivan was the named insured and Mr. Sullivan was the designated beneficiary. Mrs. Sullivan had the right under the policies to change the beneficiary, to exercise all options, and to take part in for present purposes substantially identical dividend sharing plans.[7] Mrs. Sullivan elected under both policies to have dividends accumulated at interest.[8]

The Aetna policy was of the endowment type. It was to mature at the end of twenty-six years at which time Mrs. Sullivan, then having atttained the age of sixty-five, was to receive an income of

6. It is immaterial to the points raised on this appeal that the policies designated were taken out subsequent to rather than prior to creation of the tax lien.

It is not clear from the record whether Mr. Sullivan or Mrs. Sullivan supplied the money for purchasing the policies. The point is irrelevant, however, in our view of the case.

7. The Aetna plan was representative and provided as follows: "This policy shall be entitled to share in the divisible surplus of the participating business of the Company at the end of each policy year while it is in force up to the date of maturity.

"Dividends shall be determined by the Company and shall be

"(1) Paid in cash, or

"(2) Applied to the payment of any premium or premiums, except that if the policy is paid up the dividend shall be paid in cash, or

"(3) Applied to the purchase of participating paid-up additions to the policy, payable at the date of maturity or at the prior death of the insured, or

"(4) Left with the Company to accumulate at a rate of interest not less than two per cent. compounded annually, but no interest shall accrue after default in payment of any premium and no premium shall be considered paid by reason of dividends so remaining with the Company. Accumulated dividends with interest, but less any indebtedness secured thereby under this policy, may be withdrawn on demand at any time, unless previously applied in accordance with the provisions of Section 8 [the non-forfeiture provision discussed *infra*]. Accumulated dividends with interest earned during the continuance of this policy shall be payable at the date of maturity or at the prior death of the insured if not previously withdrawn.

"Any paid-up additions or accumulated dividends available at the date of maturity may be applied to increase the monthly income specified on the first page hereof in the same proportion as such paid-up additions or accumulated dividends bear to the cash value on said date.

"Under the second option and upon default in premium payment, no premium shall be construed as being paid by reason of any unpaid dividend, but any unpaid portion of the dividend shall become payable in cash, unless cash values are available according to Table A, in which event such dividend shall be applied as provided in Section 8 of this policy.

"The second of the above four options shall be used if no other option has been elected in writing.

"In the settlement of a death claim hereunder there shall be paid a dividend for that portion of the policy year in which death occurs for which premiums have been paid."

8. Accumulated dividends are of significance on this appeal not per se but rather as a component part of the cash surrender value at pertinent times. Either in the case at bar or in the four other tax lien-insurance cases decided this day, see note 41 *infra*, no question was posed to the court below nor has been asserted before this court relating to the possibility of the existence of an independent right of recovery for dividends as such. The amount distinctively involved the details concerning which need not be set out, is minimal and perhaps it was for this reason that the issue was not introduced into already complicated proceedings. In any event the problem will not be considered sua sponte by this court inasmuch as its proper consideration would require at the outset an interpretation of each, individual insurance contract involved in the various cases. See Rule 24(2) (b) of the rules of this court. See also Stouper v. Jones, 109 U.S.App. D.C. 106, 284 F.2d 240 (D.C.Cir. 1960); Hazeltine Research, Inc. v. Avco Mfg. Corp., 227 F.2d 137 (7 Cir. 1955), cert. denied, 350 U.S. 987, 76 S.Ct. 474, 100 L.Ed. 854 (1956).

$100.00 a month for life.[9] In the event of Mrs. Sullivan's death before the policy's maturity, the proceeds of the policy were to be paid in one lump sum to the beneficiary, Mr. Sullivan.[10] The Manufacturers policy was a "whole life policy" with its face amount, $15,000.00, payable to the beneficiary, Mr. Sullivan, on the death of Mrs. Sullivan.

It is unquestioned that the policies were substantially identical in all respects material to this appeal. Generally speaking, at any given time and as to each of the policies, the part of the total premiums paid in on the policy which exceeded the insurer's accrued policy costs plus, for essential purposes, accumulated dividend amounts represented the cash value of that policy.[11] The cash value varied throughout the life of the policy. The cash value less any outstanding policy indebtedness previously incurred by the insured to the insurer constituted the cash surrender value of the policy. The cash surrender value was the amount the insured was entitled to receive on election to cancel the policy in accordance with its terms as detailed hereafter.[12]

The two policies contained a number of substantially identical provisions authorizing various uses of their respective reserves by the insured, Mrs. Sullivan.[13]

---

9. The policy provided for payment for one hundred and twenty months certain.

10. During the non-maturity phase of the Aetna policy's existence, therefore, Mr. Sullivan's status under the policy was essentially comparable to that of a beneficiary under a typical life insurance policy.

11. In United States v. Bess, 357 U.S. 51, 58 n. 3, 78 S.Ct. 1054, 1059, 2 L.Ed.2d 1135 (1958), the Supreme Court quoted the following passage from Krueger and Waggoner, The Life Insurance Policy Contract (1953 ed.), 194, the substance of which is of pertinence here: "In the level premium system of life insurance the net level premium must be higher than the monetary value of the annual risk during the early policy years, and the excess must be accumulated with interest to provide funds for payment of claims after the age is reached where the value of the annual risk exceeds the net level premium in the annual premium being paid. It is the necessary accumulation of these funds that makes possible nonforfeiture benefits. On surrender of a policy the insurer, being relieved of the obligation to provide death benefits during future years where the annual value of the risk exceeds the annual net level premium, no longer needs to retain the surrendering policyholder's contributions to the funds previously accumulated for such purpose. Since the surrendering policyholder made a contribution to these funds during the period from date of issue to date of surrender, he is equitably entitled to a return equal to the prorata share of the funds actually accumulated from premiums paid by his group of policyholders and no longer needed to assure solvency of the company for the protection of continuing policyholders." (Emphasis omitted.)

12. The cash value and cash surrender value have also been respectively termed tabular cash value, gross cash value, gross cash surrender value, and net cash value and net cash surrender value. In our view such characterizations are misleading in a context where the status and rights of a party *dehors* the insurance contract are in issue; they needlessly tend to confuse and to misdirect the basic inquiry which is necessarily focused upon the effective relationship between insured and insurer with regard to the policy reserve to which relationship the impressions conveyed by such terms as net and gross are somewhat confusing and substantially redundant. The more fundamental terminology of cash value and cash surrender value is therefore preferred initially and will be utilized here.

13. The Manufacturers policy was representative:
 "5. CASH VALUES, PAID-UP INSURANCE, EXTENDED TERM INSURANCE. The cash value referred to throughout this policy shall be determined in accordance with the Method of Computation of Non-forfeiture Benefits stated on the last page hereof.
 "(1) Upon surrender of this policy with a discharge therefor after it has a cash value, the Company will pay the cash value at the date of surrender less all indebtedness, but if the date of surrender is within sixty days after a premium due date, the cash value shall be

.The first of these gave the insured the right to elect to cancel the policy and to receive in settlement its cash surrender value. A condition precedent to the right

calculated as if the said premium had not yet fallen due.

"The Company may defer the payment of a cash value under the terms of this provision for a period of six months from the date of receipt of the application for such cash value.

"(2) Upon receipt of a written request after this policy has a cash value and within sixty days after the due date of any premium in default, the Company will grant one of the following options, calculated as if the said premium had not yet fallen due:

"(a) The Company will continue this policy as participating paid-up insurance payable in one sum, free from any existing indebtedness, for a reduced amount determined in accordance with the Method of Computation of Non-forfeiture Benefits and will endorse the policy accordingly; or

"(b) The Company will continue this policy as non-participating extended term insurance, free from any existing indebtedness and without the right to loans. The amount of the extended term insurance shall be the sum insured shown on the first page hereof less all indebtedness. The period for which such extended term insurance will run shall be determined in accordance with the Method of Computation of Non-forfeiture Benefits.

"Except as otherwise provided, such paid-up insurance or extended term insurance shall be subject to the same terms and conditions as the original policy.

"Any paid-up policy or any policy continued as extended term insurance may be surrendered within thirty days after any policy anniversary, and the Company will pay a cash value determined in accordance with the Method of Computation of Non-forfeiture Benefits.

"If option (2) (a) has not been chosen, option (2) (b) shall become effective automatically upon the expiry of the days of grace allowed for payment of the premium in default unless the Insured has requested that the Automatic Premium Loan provision be operative.

"6. LOANS. After this policy has a cash value, the Company will loan, upon the sole security of this policy, an amount not greater than the cash value less all indebtedness. The loan will be granted upon completion of the Company's loan agreement and the policy will be returned to the borrower after endorsement.

"No loan will be granted while this policy is being continued as extended term insurance.

"The Company may defer the granting of a loan (other than a loan to pay premiums on one of its policies) under the terms of this provision for a period of six months from the date of receipt of the application for such loan.

"7. AUTOMATIC PREMIUM LOANS. This policy shall not lapse for non-payment of any premium so long as the cash value exceeds all indebtedness. The Company will, without further request, loan the whole of any premium·and continue this insurance in force for the period until the next premium due date if, at the end of such period the cash value would exceed the indebtedness. If at the end of such period the indebtedness would exceed the cash value, the Company will loan a proportion of the premium and continue this insurance in force for the same proportion of the period. Such proportion shall be determined by dividing the cash value immediately prior to the due date of the premium in default less the indebtedness by the sum of such cash value so adjusted and the amount by which the indebtedness would exceed the cash value at the end of the current premium period if the whole of the premium had been loaned. If prior to the expiration of such proportionate period, the premium in default be not paid in full, all liability of the Company on this policy shall thereupon terminate.

"This provision shall become operative if requested in the application for the policy or elsewhere in writing and will be discontinued on the written request of the Insured.

"8. LOAN CONDITIONS. Interest at the rate of five per cent. per annum compounded annually will be charged on all loans made under the preceding provisions. All amounts so loaned, and interest thereon shall be a first lien on this policy in the Company's favour in priority to the claim of any assignee or any other person. If at any time the total indebtedness shall exceed the cash value, all liability of the Company on this policy shall terminate, but unless this policy lapses because a premium in default is not paid, this policy shall not terminate until thirty-one days after notice shall have been mailed to the last known address of the Insured (and of the assignee, if any).

"Wherever the word indebtedness is used in this policy it shall include interest accrued to date."

to recover the cash surrender value was surrender of the policy to the company for discharge. Mrs. Sullivan never took any action to obtain the cash surrender value of either policy other than that implicit in the policy loan transactions with Manufacturers discussed infra

The second of these provisions gave the insured the right to borrow on the security of the policy at five per cent per annum. The Manufacturers policy specifically stated and the Aetna policy provided in effect that all amounts so loaned and interest thereon were to be a first lien on the policy. Under each of the policies there was no specific obligation to repay the amount borrowed; a failure in this regard simply served to bring about a permanent reduction in the cash surrender value. But if the permanent arrearage came to exceed the cash value of the policy, the obligations of the company under the policy were terminated and the policy was thereby cancelled.

The third provision was an optional automatic premium loan clause, revocable at will, which provided in substance that in the event of a default in the payment of premiums, as long as a cash surrender value existed on the policy the company would automatically loan to the insured and apply to premium payment the amount due. The insurance policies prescribed the same terms for these loans as were applicable to general policy loans, i. e., a first lien on the policy to the extent of the loan and an interest charge of five per cent. Mrs. Sullivan elected to have the automatic premium loan provisions of the policies be operative and she did not at any time revoke her elections.[14]

Finally, a fourth substantially identical clause of significance was contained in the policies. This was a non-forfeiture provision which in substance provided that in the event of default in payment of premiums and at the election of the insured, each policy could be continued to the extent of its cash surrender value as either participating paid-up insurance or non-participating extended term insurance. In the absence of an election on the part of the insured, there was to be an automatic conversion into non-participating extended term insurance.

The non-forfeiture provision mentioned in the preceding paragraph was never operative in the instant case inasmuch as Mrs. Sullivan elected that the automatic premium loan provision of the policies should become operative in the event of premium default. The clause is nevertheless of some relevance in that Mrs. Sullivan could have revoked the applicability of the automatic premium loan provision at any time.[15]

Aetna and Manufacturers were never served with notice of lien, nor did they receive actual notice of the Government's claim from any source until later served with notice of levy, discussed infra. On July 12, 1955 and on June 24, 1957 Manufacturers granted to Mrs. Sullivan policy loans of the combined principal amount of $714.52. The policy loan amounts were applied to outstanding premiums at the request of Mrs. Sullivan. The automatic premium loan clause of course was in effect at these times, but it had not yet become operative because it made provision for a grace period which had not expired in either instance.

On January 9, 1958 Aetna and Manufacturers were served with an identical "notice of levy" under the purported authority of Sections 6331 and 6332 of the Internal Revenue Code of 1954.[16] The

---

14. In respect to one policy, it is clear that the election was made by Mrs. Sullivan in the insurance application. As regards the other policy, her election is evidenced by a stamp on its last page.

15. If the non-forfeiture clauses by their terms had become operative in the instant case, somewhat different questions might have been presented on this appeal.

16. Section 6331 provides as follows: "(a) Authority of Secretary or delegate.—If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property and rights to property (except such prop-

notice in pertinent part stated: "You are further notified that demand has been made upon the taxpayer for the amount set forth herein, and that such amount is still due, owing, and unpaid from this taxpayer, and that the lien provided for by Section 6321, Internal Revenue Code of 1954 [the current lien provision, corresponding in substance to Section 3670, Internal Revenue Code of 1939, see note 19 infra], now exists upon all property or rights to property belonging to the aforesaid taxpayer. Accordingly, you are further notified that all property, rights to property, moneys, credits and bank deposits now in your possession and belonging to this taxpayer (or with respect to which you are obligated) and all sums of money or other obligations owing from you to this taxpayer are hereby levied upon and seized for satisfaction of the aforesaid tax, together with all additions provided by law, and demand is hereby made upon you for the amount necessary to satisfy the liability set forth herein, or for such lesser sum as you may be indebted to him, to be applied as a payment on his tax liability."

On January 23, 1958 Manufacturers was served with a "final demand" which in relevant part provided as follows: "Demand is again made for the amount set forth in the notice of levy, $232,-215.64, or for such lesser sum as you may have been indebted to the taxpayer at the time the notice of levy was served. If you comply with this final demand within five days from its service, no action will be taken to enforce the provisions of Section 6332 of the Internal Revenue Code. If, however, this demand is not complied with within five days from the date of its service, it will be deemed to be finally refused by you and proceedings may be instituted by the United States as authorized by the statute quoted above." In response to this demand, on January 29, 1958 Manufacturers paid the sum of $196.41 to the Government on account of accumulated dividends. It apparently took no other action in response to the notices served upon it.

The record does not indicate that Aetna was served with any document subsequent to the original notice of levy.

Mrs. Sullivan did not pay premiums on either policy which fell due in 1958 and 1959. Accordingly, pursuant to the automatic premium loan provisions of the

---

erty as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax. * * *

"(b) Seizure and sale of property.—The term 'levy' as used in this title includes the power of distraint and seizure by any means. In any case in which the Secretary or his delegate may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible).

"(c) Successive seizures.—Whenever any property or right to property upon which levy has been made by virtue of subsection (a) is not sufficient to satisfy the claim of the United States for which levy is made, the Secretary or his delegate may, thereafter, and as often as may be necessary, proceed to levy in like manner upon any other property liable to levy of the person against whom such claim exists, until the amount due from him, together with all expenses, is fully paid."

Section 6332 provides in pertinent part as follows: "(a) Requirement.—Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary or his delegate, surrender such property or rights (or discharge such obligation) to the Secretary or his delegate, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

"(b) Penalty for violation.—Any person who fails or refuses to surrender as required by subsection (a) any property or rights to property, subject to levy, upon demand by the Secretary or his delegate, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of the taxes for the collection of which such levy has been made, together with costs and interest on such sum at the rate of 6 percent per annum from the date of such levy. * * *"

policies and notwithstanding the above-mentioned notices served on them, the insurers proceeded in those years to effect automatic premium loans on the respective policies. The automatic premium loans brought about by Manufacturers encompassed a principal amount of $888.90, and those of Aetna totalled $1319.80.

The present action was commenced on October 30, 1958. Prior to judgment and pursuant to a stipulation between the United States and the Sullivans, on January 15, 1960 and January 25, 1960 respectively, Mrs. Sullivan delivered the Aetna policy to Aetna and the Manufacturers policy to Manufacturers and on these same respective dates executed releases to the two companies. The releases, identical in pertinent part, provided that Mrs. Sullivan "agrees that the entire liability of * * * [each of the insurers under its policy] except for the cash value, is hereby discharged and terminated, and the net cash value [i. e., the cash surrender value] shall be determined as of the date of this release and paid to the United States * * *." The Aetna policy had a cash surrender value of $850.36 at the time of surrender and release. The Manufacturers policy no longer had a cash surrender value at that time.

The court below held that the Government was entitled to be paid the cash surrender value under each policy determined as of the date of surrender and release, January 15, 1960 and January 25, 1960 respectively, and that upon payment of the respective amounts, the insurance companies would be wholly discharged from their policy obligations. Accordingly, judgment was entered against Aetna for $850.36 and six per cent interest from January 15, 1960 and judgment was entered in favor of Manufacturers.

On this appeal the amount in dispute as to Manufacturers is the principal sum and interest deducted from the cash value of its policy on account of the two policy loans and two automatic premium loans effected by it. The controversy in regard to Aetna covers the corresponding amount deducted with respect to its two automatic premium loans.[17, 18]

The issues raised on the instant facts with regard to policy loans and automatic premium loans will be treated separately inasmuch as distinct considerations are involved. Before specifically discussing these issues in turn, however, it is necessary to consider the tax lien and its relation to the cash surrender value of an unmatured insurance policy.

## I THE TAX LIEN AND THE CASH SURRENDER VALUE

The Government's lien on Mrs. Sullivan's interest in the unmatured insurance policies of Aetna and Manufacturers arose by virtue of Section 3670 of the Internal Revenue Code of 1939.[19] Section 3670 provides as follows: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest * * *) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."[20] By

17. Aetna had effected two automatic premium loans on its policy prior to receiving notice of levy. The Government does not contest these transactions.

18. While the Government claims the entire amounts indicated above, the actual mechanics of the policies' operation makes it clear that it cannot even be arguably said that the Commissioner is "out of pocket" these whole sums but only that portion of the respective amounts effectively dissipated by application to the insurers' cost of the policies' maintenance. Any possible relevance and legal significance of this fact is rendered moot by the views adopted in the opinion.

19. The corresponding section in the present Code, Section 6321, Internal Revenue Code of 1954, is identical to the old provision in all relevant respects.

20. What qualifies as "property and rights to property" is, of course, to be determined by state law. See United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960). It is unquestioned that Pennsylvania law is

virtue of Section 3671 of the Internal Revenue Code of 1939, the lien attached to Mrs. Sullivan's property interests generally as of the time when the assessment list was received by the District Collector on November 5, 1952 [21] and specifically attached to her continuing interest in the insurance policies of Aetna and Manufacturers at and from the time of their issuance on May 21, 1953 and June 17, 1953 respectively. See Glass City Bank of Jeanette, Pa. v. United States, 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56 (1945).

■ On the basis of the fact that the tax lien established by and perfected pursuant to Sections 3670, 3671 and 3672, Internal Revenue Code of 1939, covered Mrs. Sullivan's interest in the two policies, the Government seemingly asserts that, subject only to the concededly subsisting automatic premium loan provisions of the policies, the tax lien was specifically attached to the respective cash surrender values themselves as held by the insurers. This argument is fundamentally premised on the hypothesis that the cash surrender value of a typical unmatured insurance policy as held by the insurer, itself constitutes "property" or "rights to property" within the meaning of Section 3670 to which the federal tax lien attaches. We find no merit in this premise in view of the nature of the relationship which exists between insurer and insured as generally recognized.

It is certainly true that the source of the effective rights of the Government in an unmatured insurance policy of a delinquent taxpayer is directly related to the cash surrender value. Generally, at any point in time the policy is worth in monetary terms to the insured no more than or no less than she can receive by virtue of its cash surrender value. This is the sum the Commissioner could receive if the taxpayer voluntarily assigned her interest in the policy to him and such amount would, of course, constitute the measure of the recovery of the Government when the Commissioner took appropriate steps to the same end by enforcing the lien on the policy by levy upon it as held by the delinquent-insured or by lien foreclosure.

■ But at least in regard to the effective scope of attachment of a tax lien, the lien can only attach to "property and rights to property" as it finds them. See and compare Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 1285, 4 L.Ed.2d 1365 (1960); United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960); United States v. A & P Bakery Supply & Equip. Co., 3 Am.Fed.Tax R.2d 579 (S.D.Fla.1959). To put the matter in its most fundamental perspective, it is unquestioned that the operative status of an insurance policy is unaffected by the mere attachment of a tax lien to a delinquent-insured's interest therein. Additionally, it is not controverted that the insured's basic right under the present type of policy is other than to have the insurer perform a certain specified obligation on the policy's maturation. The insured also has a number of other rights under this kind of policy, some of which have been indicated previously and all of which can be collectively termed a "bundle of rights." One of the insured's specific rights is entirely inconsistent with the basic right. This encompasses the discretionary power to elect to cancel the policy and receive its cash surrender value. See United States v. Massachusetts Mut. Life Ins. Co., 127 F.2d 880, 883 (1 Cir. 1942). Until such an election is made, it seems apparent under any standard that the insurer holds neither "property" nor "rights to property" to which a tax lien could attach but is simply the obligor to a broad-

---

applicable to the case at bar. Under that law Mrs. Sullivan clearly had a sufficient interest under the policies to have satisfied the requirements of the statute. See United States v. Penn Mut. Life Ins. Co., 130 F.2d 495, 142 A.L.R. 888 (3 Cir.

1942); Kyle v. McGuirk, 82 F.2d 212 (3 Cir. 1936). See generally United States v. Bess, 357 U.S. 51, 55-57, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958).

21. Compare Section 6322, Internal Revenue Code of 1954.

ly based chose in action arising out of a substantially executory contract. See United States v. Manufacturers Trust Co., 198 F.2d 366, 368 (2 Cir. 1952); United States v. Massachusetts Mut. Life Ins. Co., supra. See also Burnet v. Wells, 289 U.S. 670, 679–680, 53 S.Ct. 761, 77 L.Ed. 1439 (1933).

This court's decision in United States v. Penn Mut. Life Ins. Co., 130 F.2d 495 (3 Cir. 1942) supports the position that the insured under an unmatured insurance policy of the present nature simply has a power of election with respect to the cash surrender value, that a lien can attach to the insured's policy rights including this power of election since the lien reaches intangible as well as tangible property, but that there is nothing held by the insurer before election, either tangible or intangible, to which the lien can additionally attach. See United States v. Massachusetts Mut. Life Ins. Co., supra; United States v. Mitchell, 210 F.Supp. 810 (S.D.Ala.1962).

The Government, however, asserts that the Supreme Court's decision in United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958) compels a contrary interpretation. But the Bess case involved a clearly distinguishable situation, one in which a delinquent taxpayer who was the insured in various life insurance policies, died and the Government on the basis of a pre-existing tax lien on the taxpayer's interest in the policies, sought to impose liability on the beneficiary in the policies' proceeds. Since the policies concerned had matured,

no specific question was presented in that case as to the effective relationship between the contracting parties during the executory phase of the policies' existence.[22] Inasmuch as the deceased taxpayer's right in regard to the cash surrender values had been covered by a pre-existing tax lien, the significance of which is discussed infra, it would have been neither realistic nor in accordance with sound policy for the Government to have been held to be foreclosed from recovery merely because of the death of the delinquent taxpayer. See United States v. Behrens, 230 F.2d 504, 507 (2 Cir.), cert. denied, 351 U.S. 919, 76 S.Ct. 709, 100 L.Ed. 1451 (1956). See also Chase Nat. Bank of City of New York v. United States, 278 U.S. 327, 334–339, 49 S.Ct. 126, 73 L.Ed. 405 (1929). Accordingly, as we read the opinion and to the extent pertinent here, the Supreme Court recognized that the taxpayer's right to receive the cash surrender values was "property" or "rights to property" to which the tax lien had attached, and it held·that the lien was not extinguished by the taxpayer's death but survived to the extent of the cash surrender values existing at that time because *although the reserve on a particular policy was legally property solely of the insurer,*[23] "the surplus of the paid premiums accumulated to make up the cash surrender value should [nevertheless] be treated *for some purposes* as though in fact a 'fund' held by the insurer for the benefit of the insured." Id. 357 U.S. at 59, 78 S.Ct. at 1059, 2 L.Ed.2d 1135. (Emphasis added.)[24] See United States v. Pilley, 60–2

22. The recent decision of the Supreme Court in Meyer v. United States, 375 U.S. 233, 84 S.Ct. 318, 11 L.Ed. 293 (1963), is similarly distinguishable with regard to the instant question.

23. The Court quoted approvingly the following statement of Judge Addison Brown in In re McKinney, 15 F. 535, 537 (S.D. N.Y.1883): "[T]his excess of premiums paid [i. e., the cash surrender value] is legally the sole property of the [insurance] company * * *." 357 U.S. at 59, 78 S.Ct. at 1059, 2 L.Ed.2d 1135. While the above quote was continued to include a statement to the effect that

as a practical matter, this amount is property of the policy owner, this consideration, of course, has no bearing on the question of the effective scope of attachment of the tax lien.

24. The difficult conceptual problem which confronted the Court in the Bess case was the contention "that the right to receive the cash surrender value expires with the death of the insured and that thus no property of his passes to the beneficiary." 357 U.S. at 58, 78 S.Ct. at 1059, 2 L.Ed.2d 1135. The majority resolved this question in narrow fashion, as indicated above, by holding that "for

U. S. Tax Cas. ¶ 9794 (W.D.Tenn.1960); Flax v. United States, 179 F.Supp. 408 (D.N.J.1959).

The instant question certainly was not directly before the Supreme Court in Bess since, as previously mentioned, the insurance policies in question in that case had matured. And from the above discussion it appears clear that the Court did not even imply in Bess that the tax lien attached to any specific property held by the insurers. Indeed, what relevant implication the Bess decision does contain for the case at bar, supports our present holding. We therefore fail to see any merit in the Government's position. We will now turn to a consideration of the specific issue presented in regard to policy loans.

## II POLICY LOANS

The Government claims a right of recovery against Manufacturers regarding the company's two policy loans on the basis of the theory that the transactions in question created a creditor-debtor relationship between Manufacturers and Mrs. Sullivan and that Mrs. Sullivan's policy interest served as security for satisfaction of the obligation. If such a relationship was legally created, in view of the fact that the Government had a perfected lien on this same interest at the time of the transactions, and notwithstanding Manufacturers' lack of actual notice of the Commissioner's claim at the critical times, it follows on the basis of priority of lien that no right of setoff for policy loans and interest thereon was allowable as against the Government. See Knox v. Great West Life Assur. Co., 109 F.Supp. 207 (E.D.Mich.1952), aff'd, 212 F.2d 784 (6 Cir. 1954); United States v. Royce Shoe Co., 137 F.Supp. 786 (D.N.H.1956).

We are of the opinion, however, that the proper characterization of the status of Manufacturers with regard to the policy loan transactions both legally and functionally was that of debtor rather than that of creditor. Under the policy Mrs. Sullivan not only had the right to elect to cancel the policy and receive its cash surrender value but she also had the right to be granted policy loans to the extent of the cash value. At the time of the two policy loan requests, therefore, Manufacturers became specifically obligated to Mrs. Sullivan to the extent of the amounts demanded. And as to the particular sums themselves, Mrs. Sullivan was in no way bound or required to repay them, a failure in this regard simply serving to bring about a permanent reduction in the cash surrender value. In this most fundamental sense, therefore, the policy loan disbursements were compulsory advances pro tanto of the cash surrender value.[25]

The general rule that policy loans do not serve to create a creditor-debtor relationship but only suffice to discharge part of the insurer's ultimate policy obligation, was definitively and clearly established by Mr. Justice Holmes in Board of Assessors of the Parish of Orleans v. New York Life Ins. Co., 216 U.S. 517, 30 S.Ct. 385, 54 L.Ed. 597 (1910), a case

some purposes," the cash surrender value was to be treated as a fund held by the insurer for the benefit of the insured. Two Justices found the contention meritorious and dissented on this point.

25. The policy loan amounts were, of course, never actually physically transmitted to Mrs. Sullivan since they were applied, pursuant to her request, to outstanding premiums. This factual refinement is not of any substantive significance insofar as concerns the question of the proper legal characterization of Manufacturers' status as grantor of the loans. And while it points up the fact that Manufacturers was not only the effector of the loans but also was the recipient of the respective amounts, this circumstance in no way serves to dictate a result contrary to that reached in the opinion. An issue is posed in this regard only as to that portion of the loaned amounts dissipated against the Government by application to the insurer's cost of the policy's maintenance. And with respect to these sums Manufacturers is clearly safeguarded from liability on the present facts. See Section 6323(c), Internal Revenue Code of 1954, and the corresponding provision in the 1939 Code, Section 3672(b). The Government does not contend otherwise.

which has been cited and relied upon by the Supreme Court, the lower federal courts, and the courts of many states. Mr. Justice Holmes stated: "The so-called liability of the policy holder never exists as a personal liability, it never is a debt, but is merely a deduction in account from the sum that the * * * [insurer] ultimately must pay. * * * In substance it is extinct from the beginning, because * * * it is a payment, not a loan." Id. 216 U.S. at 522, 30 S.Ct. at 386, 54 L.Ed. 597. See Williams v. Union Cent. Life Ins. Co., 291 U.S. 170, 54 S.Ct. 348, 78 L.Ed. 711 (1934); Schwartz v. Seldon, 153 F.2d 334 (2 Cir. 1945); First Nat. Bank of Wichita Falls v. State Life Ins. Co., 80 F.2d 499 (5 Cir. 1935); Lee v. Equitable Life Assur. Soc'y, 56 F.Supp. 362 (E.D.Mo.1944); In re Hirsch, 4 F.Supp. 708 (S.D.N.Y. 1933); In re Schwartz' Estate, 369 Pa. 574, 87 A.2d 270, 31 A.L.R.2d 975 (1952). Cf. Carpenter v. Commissioner, 322 F.2d 733 (3 Cir. 1963), cert. denied, 375 U.S. 992, 84 S.Ct. 631, 11 L.Ed.2d 478 (1964).

This general principle is seemingly uncontrovertible. Additionally, the present circumstance exemplifies a situation in which the application of the rule is particularly justified on policy grounds. In this regard we quote the following from the opinion of the court below, 203 F.Supp. at 13: "Evidence produced in the Kann case [a companion case properly consolidated and tried with the instant case, see note 2 supra] indicates that six of the seven defendant companies alone made 1,408,051 policy loans amounting to $455,298,956 during the year 1960. Insurance companies have no means of maintaining accurate up-to-date records of policyholders' residence addresses and obviously have no means of knowing where the policy itself is located. A requirement that lien records of more than 3000 counties be searched in every instance in which a policyholder seeks to obtain a loan or the entire cash surrender value of a policy would pose tremendous problems.

"A survey made by one of the companies involved indicates that to make a search of lien records would cost approximately six dollars per search. The vast number of applications for loans and surrender values of policies are emergency in nature and as presently administered they represent a quick, certain way to secure funds urgently needed. Many companies pride themselves on twenty-four hour service; this would be extended if searches of the lien records of 3000 counties were required in every case. To conduct a search in any one county would require from three to five days. The inconvenience, delay and expense that would result to the millions of policyholders who apply for policy loans or cash values each year greatly exceed any interests the Government might possibly have in sustaining its position."

The only arguable basis for adoption of the Government's approach, as also stated by the court below, 203 F.Supp. at 12, "is the form of the transactions, i. e., loans are carried as assets on the companies' books, interest is charged and so reflected on the companies' books, a Pennsylvania statute expressly permits policy loans to be used as an investment for insurance company capital and reserves, and policy loans are listed as assets of the companies in their reports filed with the insurance authorities of the states." The court went on to state: "However, none of these factors compel a departure from this well-settled concept.

"On the contrary, the testimony in this case indicates that the accounting procedures are necessary to meet the solvency requirements of state law, that reserves must be computed upon the basis of certain specific actuarial assumptions which relate to the gross amount of insurance outstanding, age of the individuals, etc., that it is accordingly more convenient to treat advances as a separate item, that there is no obligation of repayment and that the interest charged merely represents what it is estimated the sum would have earned if it had not been advanced."

Wholly apart from the fundamental canon that form should not be allowed to prevail over substance, there

is no valid basis for essential disagreement with these expressions of the court below. We therefore hold that Manufacturers granted the two policy loans in the capacity of debtor and that the respective amounts were partial advances of the cash surrender value. Accordingly, the Government cannot prevail over Manufacturers as to these sums on the basis of priority of lien.

The Government has not set forth any other theory, nor can we conceive of any additional, reasonably arguable basis for holding Manufacturers accountable for the policy loan amounts inasmuch as these transactions were effectively consummated prior to the company's receipt of actual notice of the tax lien.[26] It therefore follows that this part of the Government's appeal fails.

### III AUTOMATIC PREMIUM LOANS

The most difficult aspect of the case at bar concerns the issue posed with regard to automatic premium loans. It is a question different in kind from that presented by policy loans where the operative status of the insurance contract was not in issue but simply the problem of when, as to sums validly coming due under the policy, a duty arises on the part of the insurer to act in a manner consistent with safeguarding the Government's interest. And in this regard we have held merely that no issue of duty and therefore accountability can arise as to transactions effectively consummated by the insurer prior to its reception of actual notice of the Commissioner's claim.

Actual notice in itself, however, does not provide any sort of basic test necessarily also applicable to and determina-

tive of the instant question inasmuch as what is involved here is the effective status of the policies in light of the tax lien. Stated in a way which poses the problem, the lien on any debts brought about by the functioning of the automatic premium loan clauses is subject to those provisions' further operational requirement that such amounts be applied to premium payment.[27]

The Government concedes the essence of the foregoing, that the mere attachment of the tax lien to Mrs. Sullivan's interest in the two policies could not effect per se the intrinsic operation of the policies and their automatic premium loan provisions, that the insurance contracts, including those clauses, remain in force until some legally effective step is taken against their operation by the Commissioner, and that until such time the insurers without risk on their part are entitled to effectuate automatic premium loans in accordance with the terms of their policies.

One such step, according to the Government, which suffices to render ineffective the automatic premium loan provisions of the policies, is the service of notice of levy upon the insurers. Specifically, the Government contends that notice of levy "is a formal notice to the insurer that the automatic premium loan provision is revoked"[28] and constitutes a valid "demand under the terms of the contract for the cash surrender value."[29]

Aetna and Manufacturers argue in substance, on the other hand, that the automatic premium loan provisions of the policies cannot be rendered inoperative and the cash surrender values cannot be demanded validly by levy upon the in-

26. See generally United States v. Eiland, 223 F.2d 118, 121-122 (4 Cir. 1955); United States v. Polan Indus., Inc., 196 F.Supp. 333, 338 (S.D.W.Va.1961); United States v. Jacobs, 155 F.Supp. 182, 189-190 (D.N.J.1957); Plumb, Federal Tax Collection and Lien Problems, 13 Tax L. Rev. 247, 309-310 (1958).

27. In United States v. Mitchell, 210 F. Supp. 810, 815 (S.D.Ala.1962), the court stated: "The United States could not rewrite the policies of the defendant insurance companies by giving notice of a tax lien to such companies. * * * [I]t was the duty of the insurance companies to make use of the cash surrender value of * * * .[their respective] policies in accordance with the * * * premium loan provisions of such policies, even after actual notice of the Government's lien."

28. Brief for Appellant, p. 43.

29. Ibid.

surers in the absence of a voluntary assignment of the policy by the delinquent-insured to the Commissioner, that the appropriate remedy of the Government is either levy on the insurance policy itself as held by the insured or judicial foreclosure, and accordingly that it is only at the time when either of these two remedies is pursued and perfected that the insured's interest in the policies can be effectively reached.

The Government does not dispute the availability of the two remedies emphasized by the insurers. The disagreement between the parties is limited to the question of whether the Commissioner has the additional right to proceed directly against the insurers.

We have already indicated our view that policy loans are in substance advances pro tanto of the cash surrender value. This same conclusion applies just as readily regarding the characterization of automatic premium loans. It necessarily follows that no issue concerning priority of lien is involved in the instant problem. Rather the ultimate question posed is whether Aetna and Manufacturers are liable for the statutory "penalty" prescribed by Section 6332, Internal Revenue Code of 1954, set out infra, in the circumstance at bar.[30] Since it is clear, however, that Section 6332 cannot be given a meaning apart from the statutory levy scheme in general, the fundamental issue presented is whether the levy provisions of the Code are of avail to the Commissioner as against insurers with regard to unmatured insurance policies of the present nature.

The basic levy provision of the Internal Revenue Code of 1954, Section 6331, in pertinent part provides as follows: "(a) Authority of Secretary or delegate. —If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax. * * * (b) Seizure and sale of property.—The term 'levy' as used in this title includes the power of distraint and seizure by any means. In any case in which the Secretary or his delegate may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible)."

Section 6332, Internal Revenue Code of 1954, as previously indicated, is the provision of particular relevance in the case at bar. It provides in pertinent part as follows: "(a) Requirement.— Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary or his delegate, surrender such property or rights (or discharge such obligation) to the Secretary or his delegate, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process. (b)

---

30. Of course a lien is merely a charge against specified "property" which by itself in no way creates liability as to one who diminishes the value of the "property" subject to the lien. For the Government to prevail, if at all, on the issue at bar, some appropriate theory of liability must be found to be applicable as against the insurers. In this regard liability could conceivably be based either upon Section 6332 or possibly on common-law principles. As a practical mat-

ter, however, the views we adopt with respect to the statutory question are such as to dispose also of any tenable argument as to the possibility of common-law liability.

While technically, the present action is simply one of lien foreclosure, nevertheless inasmuch as the operative facts are clear, a fundamental question of law is presented, and the parties have fully argued this issue in substance, we deem it appropriate to decide the question.

Penalty for violation.—Any person who fails or refuses to surrender as required by subsection (a) any property or rights to property, subject to levy, upon demand by the Secretary or his delegate, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of the taxes for the collection of which such levy has been made, together with costs and interest on such sum at the rate of 6 percent per annum from the date of such levy."

Preliminarily, it is necessary to emphasize that the instant issue relates to a general question of statutory construction, i. e., whether the Commissioner is empowered to exercise the contractual rights and powers of a delinquent-insured under an unmatured insurance policy,[31] in particular, the right to demand the cash surrender value and the right to revoke the applicability of the automatic premium loan provision. In terms of the Code and in view of the nature of the issue presented, it is not possible to distinguish between these two rights, both of which it has been asserted the Commissioner validly exercised in the case at bar. The basic question posed is the same with regard to each: whether or not the Commissioner is unilaterally empowered to alter an existing tripartite contractual arrangement of the present nature, the two asserted rights simply representing respectively, the power to cancel the insurance contract in whole, as is discussed infra, and the power to cancel one particular clause.

 Levy is a summary, non-judicial process, a method of self-help authorized by statute which provides the Commissioner with a prompt and convenient method for satisfying delinquent tax claims. See Bull v. United States, 295 U.S. 247, 259–260, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). See also New Hampshire Fire Ins. Co. v. Scanlon, 362 U.S. 404, 407–408, 80 S.Ct. 243, 4 L.Ed.2d

826 (1960). Statutory levy is substantially broader in scope than anything known to the common law, and it is applicable to intangible as well as to tangible property. See Glass City Bank of Jeanette, Pa. v. United States, supra. When validly invoked, it effects a seizure of the delinquent's property tantamount to a transferal of ownership. See United States v. Eiland, 223 F.2d 118, 121 (4 Cir. 1955). The very nature and breadth of this somewhat drastic administrative process gives continued emphasis to its *raison d'être* and serves to underscore the fundamental truth that "taxes are the lifeblood of government, and their prompt and certain availability an imperious need." Bull v. United States, supra, 295 U.S. at 259, 55 S.Ct. at 699, 79 L.Ed. 1421.

 It does not follow, however, that statutory levy was available to the Commissioner as against Aetna and Manufacturers in the circumstance at bar since no present obligation existed on the part of the insurers and the contractual arrangements in question were tripartite in nature. The levy provisions of the Code are essentially procedural and remedial in the sense that they provide the Commissioner with an optional alternative, when practicable, to the more cumbersome judicial foreclosure procedure supplied by Section 7403, Internal Revenue Code of 1954, set out in note 1 supra, for the enforcement of tax liens. Statutory levy, as indicated above, grants to the Commissioner an extremely broad power with regard to collection of delinquencies. But implicit in the statute is the principle that the Commissioner acts pursuant to the collection process in the capacity of lienor as distinguished from owner. Moreover, nowhere in the Code is there a provision granting to the Commissioner power over property interests of delinquents comparable to that given the trustee in bankruptcy with respect to conversion of life insurance into a matured obligation. See 11 U.S.C.A.

---

31. There is no legislative history of pertinence to this particular question.

§ 110, sub. a(3) and (5);[32] Cohen v. Samuels, 245 U.S. 50, 38 S.Ct. 36, 62 L.Ed. 143 (1917); Plumb, Federal Tax Collection and Lien Problems, 13 Tax L.Rev. 247, 255 n. 61 (1958). Finally, we can find no statutory warrant for a conclusion that the Commissioner in the course of the collection process is vested with broad powers characteristic of a court-appointed receiver.

Additionally and more fundamentally, it appears obvious that if the Commissioner could with validity unilaterally acquire the cash surrender value of a delinquent-insured's policy by means of levy upon the insurer in the present type of circumstance, the necessary result of such action would be the termination of the policy and, with one clear exception noted below, all interests therein in just as conclusive a manner as if the insured himself or herself had been the demanding and receiving party.[33] The application of the remedy of levy and distraint against insurers with respect to unmatured insurance contracts would be unique, therefore, in that such action would result in a *fait accompli,* the insurance contracts and the interests therein being extinguished.[34]

In our view, to interpret the statute as admitting of such a consequence would be to impute to statutory levy a substantive significance which never was contemplated by Congress and which indeed is rejected by strong implication in the statute itself. Section 6337 of the Internal Revenue Code of 1954, set out below,[35] grants to the owner

---

32. Section 110 is entitled "Title to property" and provides in pertinent part as follows:

"(a) The trustee of the estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located. * * * (3) powers which he might have exercised for his own benefit, but not those which he might have exercised solely for some other person; * * * (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered * * *."

33. The one exception, of course, would be that to the extent that a beneficiary's rights under an insurance policy were vested rather than amounting to a mere expectancy, his or her interest could not be legally affected by the levy procedure as such, the Commissioner's recovery in any event being limited to the amount which constituted the value of the delinquent's rights. This, however, suggests the possibility of double liability on the part of insurers. Compare note 37 *infra,* and accompanying text.

34. The Government's only argument to the contrary is the extremely weak one that "*as a practical matter,* levy [upon the insurer] does not *require* the immediate cancellation of the insurance policy." Brief for Appellant, p. 47. (Emphasis added.) Of course, it is conceivable that the parties to insurance contracts so terminated could enter into some kind of a novation, identical in substance to the terms of the old policies. This, however, assumes a willingness on the part of the insurers which cannot necessarily be gainsaid but which nevertheless may not be present in particular circumstances. In the absence of such a willingness of the insurers, irreparable harm could result to the interested parties.

35. Section 6337 which represents no substantial change from prior law, is entitled "Redemption of property" and provides as follows:

"(a) Before sale.—Any person whose property has been levied upon shall have the right to pay the amount due, together with the expenses of the proceeding, if any, to the Secretary or his delegate at any time prior to the sale thereof, and upon such payment the Secretary or his delegate shall restore such property to him, and all further proceedings in connection with the levy on such property shall cease from the time of such payment.

"(b) Redemption of real estate after sale.—

"(1) Period.—The owners of any real property sold as provided in section 6335, their heirs, executors, or administrators,

of seized property a right of redemption with respect to such property, which right is exercisable over certain defined periods of time. This provision seems to be of significance in two interrelated respects regarding the instant question. First and foremost, it strongly tends to indicate that the remedy of levy and distraint was not meant to be applied against assets in such a manner as to destroy them by that very action. Second, it manifestly makes relevant considerations of fairness to the insured, albeit possibly delinquent, taxpayer. Whatever other rights and remedies a purported delinquent may have against the Government in a particular circumstance, he is entitled to this additional one. A right of redemption would be of no utility in the present circumstance and would therefore be illusory. Moreover, the instant situation represents the very type of case in which such a right would be

of most critical import and practical utility inasmuch as the value of an insurance policy of the present nature is not strictly defined by its monetary worth.[36]

■■■ Finally, in view of the nature of the problem at issue it is not readily apparent how a decision in favor of the Government in the case at bar could be realistically distinguished in terms of the statute from a situation in which an innocent (i. e., nondelinquent) third party is concerned as insurance beneficiary. And the parties to this appeal have tacitly assumed that the delinquent status of the beneficiary, Mr. Sullivan, under the instant policies was immaterial to the present question. Insurance involves complex intangible interests with the rights of beneficiaries inseparably interwoven with those of delinquent-insureds for the purpose at hand,[37] a fact which

or any person having any interest therein, or a lien thereon, or any person in their behalf, shall be permitted to redeem the property sold, or any particular tract of such property, at any time within 1 year after the sale thereof.

"(2) Price.—Such property or tract of property shall be permitted to be redeemed upon payment to the purchaser, or in case he cannot be found in the county in which the property to be redeemed is situated, then to the Secretary or his delegate, for the use of the purchaser, his heirs, or assigns, the amount paid by such purchaser and interest thereon at the rate of 20 percent per annum.

"(c) Record.—When any lands sold are redeemed as provided in this section, the Secretary or his delegate shall cause entry of the fact to be made upon the record mentioned in section 6340, and such entry shall be evidence of such redemption."

36. In this regard it is significant that even the Bankruptcy Act, see note 32 *supra*, and accompanying text, makes some provision for the protection of insured-bankrupts. A proviso to Section 10, sub. a (5), 11 U.S.C.A., reads as follows: "*And provided further*, That when any bankrupt, who is a natural person, shall have any insurance policy which has a cash surrender value payable to himself, his estate, or personal representatives, he may, within thirty days after the cash surrender value has been ascertained and

stated to the trustee by the company issuing the same, pay or secure to the trustee the sum so ascertained and stated, and continue to hold, own, and carry such policy free from the claims of the creditors participating in the distribution of his estate under the bankruptcy proceedings, otherwise the policy shall pass to the trustee as assets;"

37. Even the effective legal relationship which exists between the interests of insured and beneficiary is sometimes difficult of ascertainment. As was said by the Sixth Circuit in United States v. Stock Yards Bank, 231 F.2d 628, 631 (1956), "distraint is a rough and ready remedy. This short cut form of self-help developed by the common law has been available to the government in pursuit of delinquent taxpayers since the eighteenth century. * * * When the value and nature of the taxpayer's property rights are not in question, distraint is no doubt a useful tool in the effective enforcement of the Internal Revenue laws. But it is a blunt instrument, ill-adapted to carve out property interests where their nature and extent are unclear." See generally Bull v. United States, 295 U.S. 247, 259–260, 55 S.Ct. 695, 79 L.Ed. 1421 (1935) ; United States v. Aetna Life Ins. Co., 46 F.Supp. 30, 37 (D.Conn.1942). See also New Hampshire Fire Ins. Co. v. Scanlon, 362 U.S. 404, 80 S.Ct. 843, 4 L.Ed.2d 826 (1960).

brings into play not only the question of fairness to the beneficiaries but also the matter of the traditional and great interest of the states in the area of insurance. The Commissioner, as previously indicated, clearly has available to him in the situation at bar two other remedies, one of which is of a summary nature and both of which would better safeguard the interest of beneficiaries than would the proposed procedure.[38] With this in mind, we find it extremely difficult to ascribe to Congress an intention to grant to the Commissioner this additional, discretionary power. Innocent third parties should be entitled to no less than the fullest protection consistent with the realties of tax administration and enforcement.

We are mindful of the consideration that legislation in aid of collection of Government revenues should be liberally construed and applied. There is obviously an imperative public interest in favor of the prompt collection of delinquencies. But manifestly it cannot be validly considered an overriding policy in any particular situation unless Congress has so demonstrated its intention. With regard to the present issue, the levy provisions on their face do not authorize the Commissioner to exercise the taxpayer's rights, nor do we think, for the sum

---

38. For example, if, subsequent to levy upon a policy held by a delinquent, a tax sale was conducted in accordance with Section 6335, Internal Revenue Code of 1954, the Commissioner could set a minimum bid representing the cash surrender value of the policy, which certainly the beneficiary would be entitled and would have the opportunity to accept. By this means his or her interest would be more effectively safeguarded than by the disputed remedy, with minimal inconvenience to the Commissioner.

Section 6335 in pertinent part provides:

"§ 6335. Sale of seized property

"(a) Notice of seizure.—As soon as practicable after seizure of property, notice in writing shall be given by the Secretary or his delegate to the owner of the property (or, in the case of personal property, the possessor thereof), or shall be left at his usual place of abode or business if he has such within the internal revenue district where the seizure is made. If the owner cannot be readily located, or has no dwelling or place of business within such district, the notice may be mailed to his last known address. Such notice shall specify the sum demanded and shall contain, in the case of personal property, an account of the property seized and, in the case of real property, a description with reasonable certainty of the property seized.

"(b) Notice of sale.—The Secretary or his delegate shall as soon as practicable after the seizure of the property give notice to the owner, in the same manner as that prescribed in subsection (a), and shall cause a notification to be published in some newspaper within the county wherein such seizure is made, or, if there be no newspaper published in such county, shall post such notice at the post office nearest the place where the seizure is made, and in not less than two other public places. Such notice shall specify the property to be sold, and the time, place, manner, and conditions of the sale thereof. * * *

"(c) Sale of indivisible property.—If any property liable to levy is not divisible, so as to enable the Secretary or his delegate by sale of a part thereof to raise the whole amount of the tax and expenses, the whole of such property shall be sold.

"(d) Time and place of sale.—The time of sale shall not be less than 10 days nor more than 40 days from the time of giving public notice under subsection (b). The place of sale shall be within the county in which the property is seized, except by special order of the Secretary or his delegate.

"(e) Manner and conditions of sale.—

"(1) Minimum price.—Before the sale the Secretary or his delegate shall determine a minimum price for which the property shall be sold, and if no person offers for such property at the sale the amount of the minimum price, the property shall be declared to be purchased at such price for the United States; otherwise the property shall be declared to be sold to the highest bidder. In determining the minimum price, the Secretary or his delegate shall take into account the expense of making the levy and sale."

Of course, if the Commissioner elected to proceed by judicial foreclosure under Section 7403, Internal Revenue Code of 1954, set out in note 1 *supra*, the beneficiary would properly be made a party to the proceeding.

of the foregoing considerations, that this power can be reasonably implied.[39]

We cannot believe that it was the intention of Congress as manifested in the present levy provisions of the Code that the Commissioner be authorized to exercise the insured's rights in this delicate area, thereby sanctioning the disregard in practice of other more appropriate and substantially equivalent enforcement procedures which would better safeguard the rights of interested parties. Compare Meyer v. United States, 375 U.S. 233, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963). Accordingly, we hold that the steps taken against Aetna and Manufacturers in the instant case were not legally effective to exercise Mrs. Sullivan's policy rights and that therefore until some other legally cognizable step was taken by the Government to avail itself of these powers, the insurers were under the duty to effectuate automatic premium loans in accordance with the terms of their policies and were not legally entitled to "surrender" to the Commissioner the policies' cash surrender values. It follows that Aetna and Manufacturers cannot be held liable for the statutory "penalty" prescribed by Section 6332.

The Government argues finally regarding automatic premium loans and the cash surrender values that the date Aetna and Manufacturers were served with its complaint in the instant case is determinative of its rights. The action below was commenced on October 30, 1958 and both insurers were served with summons and complaint on November 5, 1958. Each of the insurers effected one of its two previously mentioned automatic premium loans subsequent to this time but prior to the dates of execution of the releases set out supra.

In our view commencement of suit and service of process in themselves were no more effective than notice of levy in serving as a revocation of the automatic premium loan provision of the policies and a demand for the cash surrender value. No sound legal basis has been advanced for a conclusion that the relationship between the parties to the insurance contract could be altered effectively by this means. Commencement of suit and service of process are of legal significance but only in that they serve to confer jurisdiction in the cause on the issuing court.[40] On this basis it may well be that the Government thereafter could

39. The considerations set out in the opinion, we think, serve to distinguish in substance the present circumstance from an ordinary indebtedness with regard to the appropriateness of levy. We therefore distinguish the bank-deposit cases. Compare United States v. Manufacturers Trust Co., 198 F.2d 366, 368 (2 Cir. 1952). We do not mean to imply that it is our belief that an unmatured insurance policy is or is necessarily comparable in any respect to a negotiable instrument. Our conclusion to the effect that the Commissioner is not empowered to proceed by levy directly against insurers in the present circumstance is rested entirely upon other considerations. The foregoing distinction is relevant to a question unnecessary to resolve in the instant case, i. e., that regarding the proper delimitation of jurisdiction in Section 7403 actions. See note 40 infra.

40. See and compare the following cases with respect to the kind of final order to be entered: United States v. Roark, 57-2 U.S.Tax Cas. ¶ 9883 (W.D.Mo. 1957), per curiam, judgment ordered to be vacated and new judgment directed to be entered in accordance with parties' stipulation, 263 F.2d 840 (8 Cir. 1959); United States v. Ison, 67 F.Supp. 40 (S.D.N.Y.1946); Smith v. Donnelly, 65 F. Supp. 415 (E.D.La.1946). See also United States v. Trout, 46 F.Supp. 484 (S.D.Cal.1942).

Inasmuch as no question is raised in the instant case regarding proper jurisdiction over the parties in the foreclosure action below, the issue of the mode of service of process on the insured which would suffice to vest a court with power to deal effectively with the insurer's obligation, is not before us. We do not view our present opinion as being dispositive of this question. See note 39 supra. It is one thing to reason that the Commissioner is not empowered to act effectively against insurers in the present situation, quite another to conclude that a court in a proper circumstance with jurisdiction over the insurer, is similarly limited. See and compare United States v. Brody, 213 F.Supp. 905 (D.Mass.1963).

have properly availed itself of the court's processes and by this means would have been able to take effective steps against the insurers before the time when the automatic premium loan provisions of the policies became operative. Suffice it to say that no such steps were attempted in the instant case and that therefore no question is presented here in that regard. The Government's contention concerning the legal significance of commencement of suit and service of process is without merit.

We have considered the other points raised and are of the view that none requires discussion.

 The Government was entitled to the cash surrender values of the Aetna and Manufacturers policies determined as of the dates of their surrender and release, and interest thereon from those times. The Government did not have the right to recover from the insurers the amounts of the policy loans and automatic premium loans with interest which were effected after recordation of lien and service of notice of levy respectively.[41]

The judgment will be affirmed.

HASTIE, Circuit Judge (dissenting in part).

In United States v. Bess, 1958, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135, the Supreme Court reasoned that the right of an insured to the cash surrender value of an unmatured life insurance policy is a "right of property" to which a federal tax lien under section 3670 of the Internal Revenue Code attaches. While the litigation in that case occurred after the death of the insured, the Court's reasoning was that the insured "possessed just prior to his death, a chose in action in the amount stated [i. e., the cash surrender value] which he could

---

41. Attached as an appendix to this opinion, p. 123, is a "Tabulation of Information re Life Insurance Policies," the contents of which are pertinent not only to this case but to the four other tax lien-insurance cases set out below, the opinions in which are filed concurrently with the opinion in this case. The statements contained in the "Tabulation" were prepared by counsel for the parties and are in effect a stipulation. The items within parentheses are not to be found in the respective records of the five cases.

The four other cases are as follows: United States v. Kann, at our No. 14,092; United States v. Wilson, Massachusetts Mutual Life Insurance Company, Appellant, at our No. 13,858; United States v. Wilson, Travelers Insurance Company, Appellant, at our No. 13,859; and United States v. Bankers National Life Insurance Company, at our No. 13,957.

The "Tabulation" was prepared and submitted at the direction of this court. It was not before either of the courts below. This court, of course, cannot supplement the record and use as a basis for its decision any factual material which was not before the courts below at the times of the trials. We believe, however, that we have decided the five cases on operative facts in the respective records.

The "Tabulation" is attached for such aid as it may afford the Supreme Court should certiorari be granted and if certiorari be not granted, the items contained in the "Tabulation" may be stipulated into the respective records upon the new trials in the court below of the cases required to be sent back for further proceedings. The "Tabulation" attached to the opinion in this case shall be deemed to be an appendix to each of the opinions in the other four cases. In case of variances between the dates as set out in the opinions of this court and the dates as listed in the "Tabulation," the former are, of course, to be considered determinative for the purpose of our adjudications. But what we have said is not intended to prohibit the United States District Court for the District of New Jersey upon remand of the two cases designated hereinafter, from determining any actual pertinent date or dates and making necessary findings of fact in respect thereto. The two cases are United States v. Wilson, Massachusetts Mutual Life Insurance Company, Appellant, supra, and United States v. Bankers National Life Insurance Company, supra. We have found but one significant discrepancy as will appear on examination of the last paragraph in note 15 in our opinion in United States v. Wilson, Massachusetts Mutual Life Insurance Company, Appellant, supra.

have collected in accordance with the terms of the policies." 357 U.S. 56, 78 S.Ct. 1058, 2 L.Ed.2d 1135. The Court explicitly characterized this interest in the unmatured policy as " 'property' or 'rights to property', within the meaning of § 3670, in the cash surrender value." *Id.*

Moreover, since the policy was not surrendered during the lifetime of the insured, I think the Bess case holds, by necessary implication, that such surrender is not prerequisite to the government's acquisition of a lien upon the cash surrender value. United States v. Brody, D.Mass.1963, 213 F.Supp. 905.

In the present case, the government's general tax lien covered the rights of the insured in the policies in suit, but without particularizing among various alternative rights accorded the insured under the terms of the policies. However, when the United States, acting pursuant to section 6331 of the Internal Revenue Code, served upon the insurer its notice of levy and demand covering "all property, rights of property * * * now in your possession and belonging to the taxpayer (or with respect to which you are obligated) and all * * * obligations owing from you to the taxpayer", the government made a meaningful demand for whatever amount the insured could then require the insurer to pay him. That amount was the then cash value of the policy. Section 6332 of the Internal Revenue Code required the insurer to honor that demand. Moreover, section 6332 imposes upon the person who fails to comply with such a demand a personal obligation to the United States "in a sum equal to the value of the prop-

erty or rights not so surrendered". I do not see how any subsequent use of part of the then cash value of the policy for automatic premium payments could reduce the personal obligation of the insurer under section 6332, as that obligation arose at the time of levy. In this respect, I disagree with the majority. I think this aspect of the problem is properly analyzed and ruled upon in United States v. Salerno, D.Nev.1963, 222 F. Supp. 664.

On the other hand, I agree with the majority that the policy loans made to the insured for premium payments before service of notice of levy upon the insurer were not precluded by the general lien of the United States upon all property of the taxpayer. For the policy remained fully operative with premiums becoming due and with options available to the insured in connection with the obligation to pay premiums. The government had not indicated to the insurer what right, if any, it would assert, or when, among the complex of alternative rights the insured could claim under the policy. Therefore, the making of a premium loan under the terms of the policy could not reasonably be viewed as action inconsistent with the general tax lien. It was not until the notice of levy was served upon the insurer that the United States made a meaningful assertion of an election to claim the amount to which the insured was then entitled, namely, the cash surrender value.

I would measure the government's rights against each insurer by the cash surrender value of its policy at the time when notice of levy and demand was served upon it.